661 So.2d 1117 (1995)
Linda Ferguson MAGEE
v.
Richard Leon MAGEE.
No. 93-CA-00512-SCT.
Supreme Court of Mississippi.
September 28, 1995.
*1119 Lawrence Primeaux, Meridian, for appellant.
Robert M. Dreyfus, Jr., Dreyfus & Evans, Meridian, Steven D. Slade, Meridian, for appellee.
Before PRATHER, P.J., and SULLIVAN and JAMES L. ROBERTS, Jr., JJ.
JAMES L. ROBERTS, Jr., Justice, for the Court:

INTRODUCTION
This domestic appeal by the wife seeks reversal of the chancellor's award to her of periodic alimony, the denial to her of lump sum alimony, the denial to her of attorney's fees, and the chancellor's deviation from a consent in writing, signed by both parties, providing for mortgage payments by husband on the marital home awarded exclusively to the wife. The husband has filed a cross-appeal assailing the excessiveness of periodic alimony awarded to the wife.
The wife, Linda Magee, hereinafter "Linda", appeals from a final judgment entered on March 31, 1993, (1) denying her any lump sum alimony; (2) awarding her $1,600 per month periodic or continuing alimony until wife's death or remarriage; (3) modifying, so as to subsume monthly mortgage payments in the award of periodic alimony, a consent in writing signed by both parties whereby both agreed that husband would pay to mortgagees the mortgage notes on the marital home awarded to Linda; and (4) denying wife $2,510.19 in reasonable attorney's fees.
The husband, Richard Leon Magee, hereinafter "Pete", has filed a cross-appeal, claiming that a monthly award of $1,600 in periodic alimony was both excessive and against the overwhelming weight of the evidence.
In summary, we affirm the chancellor in his $1,600 award of periodic alimony and in his denial of attorney's fees; reverse and render the chancellor's judicial fiat limiting Linda's annual earnings to $12,000, and reverse and remand on the question of whether or not Linda is entitled to an equitable division of Pete's future retirement benefits accumulated after the date of their marriage. Pete's cross-appeal and Linda's request for attorney's fees for her representation in this appeal are denied as well as is her request of attorney's fees for defense of the cross-appeal.
We remand this case to the chancellor for the purpose of re-evaluating the denial of lump sum alimony and evaluating, within the context of an equitable distribution of marital assets, whether Linda should share in Pete's *1120 retirement benefits pursuant to Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994).

STATEMENT OF THE CASE
On December 17, 1992, Linda filed a Complaint for Divorce against Pete, her husband of seventeen years, seeking a divorce on the grounds of habitual cruel and inhuman treatment and adultery or, in the alternative, irreconcilable differences. Pete answered on March 19, 1993. Both Linda and Pete appeared for trial on March 30, 1993, during the course of which the parties entered into a Consent to Divorce on the Ground of Irreconcilable Differences pursuant to Miss. Code Ann. § 93-5-2, resolving certain issues and leaving other issues for adjudication by the court.
The parties agreed that Linda would have exclusive use, ownership, and possession of the marital home and Pete would pay the first and second mortgages which amounted to $680 per month. Linda would have ownership of the 1992 Ford Explorer, all furnishings in the marital home, the John Deere tractor, her pension with USF & G, the yard implements, her guns, one hundred shares of Nabisco stock, and her personal belongings. Pete would have ownership of his personal tools, the recreational equipment, his guns, and his personal effects.
Pete and Linda agreed that the chancellor would adjudicate the amount and form of alimony, both lump sum and periodic, to be awarded to Linda; what would happen in the event Linda sold the marital home; Linda's claim for attorney's fees; ownership of Pete's 401K plan, the 1990 Goldwing motorcycle, and the Nabisco collectibles; and whether Pete would continue providing Linda's medical insurance coverage for two or three years.
At the conclusion of the trial, the chancellor entered a judgment granting the parties certain relief in accordance with the consent and granting them a divorce on the ground of irreconcilable differences.
Linda's appeal focuses upon the chancellor's denial of lump sum alimony, the inadequacy and conditions of periodic alimony, the chancellor's deviation from the agreement of the parties as to the indebtedness on the marital home, and the denial of attorney's fees. Pete's cross-appeal assails the excessiveness of periodic alimony.

FACTS
Pete and Linda met while both were working for the Nabisco Company in Meridian. They married each other on April 15, 1976. It was the second marriage for both. No children were born of this marriage. At the time of their divorce, Pete and Linda had been married nearly seventeen years. Pete was forty-eight, and Linda was forty-six years of age at the time of the hearing. Both Pete and Linda had a high school education. Pete had taken some college courses but was not a college graduate.
Linda had been employed by the United States Fidelity & Guaranty Insurance Company, hereinafter "USF & G", in Meridian from 1980 to 1991, where she worked as a Commercial Lines Technician for which she was paid approximately $22,000 annually. In November of 1991, Linda's job was moved to Jackson as part of a company reorganization. She and Pete elected to remain in Meridian, and Linda did not return to work. During the pendency of the divorce action, Linda was temporarily employed as a bookkeeper at $5.50 per hour. After April 11, 1993, Linda was not employed, and had no income.
During her employment with USF & G, Linda accumulated approximately $13,000 in a 401K retirement plan. She withdrew the entire amount when her employment was terminated and used it for household expenses, living room furniture, a down payment on a 1992 Ford Explorer, and a trip to Japan to visit her son and grandchild. Linda's retirement plan with USF & G will entitle her to a monthly benefit of $152.56 payable at age sixty-five.
Pete had been employed with RJR Nabisco since February 1, 1967, and during the course of his marriage to Linda worked as a sales manager for the Meridian office. He received a handsome base salary plus an occasional bonus that was based upon sales. Pete's W-2 form for the year 1992 reflects that he earned $66,002 from his employment *1121 with Nabisco. This equates to a gross monthly salary of $5,500.
As of March 31, 1993, Pete had accumulated $104,548 in a retirement account administered by Nabisco with an expected monthly retirement benefit of $2,584 payable at age sixty-five. Pete had also accumulated between $49,000 and $53,000 in his own 401K retirement plan, and he owned one hundred shares of Nabisco stock valued at $800.
The parties were joint owners of a three bedroom, two bath home constructed out of western cedar in Collinsville, Mississippi, on three acres of improved land which also accommodated a sixteen by thirty-two foot swimming pool and a storage shed. Pete testified that the value of the home was $95,000 while Linda presented a tax assessor's revaluation reflecting that for tax purposes the marital home had a market value of $64,750. There was a first and second mortgage on the house with balances of approximately $25,000 and $18,000. The couple's monthly house note was $680.
The marital home was appropriately furnished with many of the items dating from the time of the marriage. Linda estimated the value of household furnishings and appliances to be around $5,000 while Pete estimated their worth to be $35,000.
Linda relied upon Pete's employment with Nabisco for her medical, hospitalization and dental insurance coverage.
The parties also owned a 1992 Ford Explorer valued between $17,000 (per Linda) and $18,000 (per Pete), a 1990 John Deere tractor valued between $7,000 (per Linda) and $10,000 (per Pete), and a Honda motorcycle with a value of $10,000 (per Pete) and $7,000 (per Linda).
Linda characterized their manner of living as "extravagant" while Pete described it as "very comfortable by most standards." Their lifestyle included traveling around the country for pleasure, often on impulse for a weekend. Linda's expense statement reflects a monthly expense of $775 for entertainment, including recreation and travel. Typical trips together included junkets to Canada, New York, the Smokey Mountains, Florida, Colorado, the western Caribbean, Cozumel, Mexico, Jamaica, Labadee, and Haiti. They purchased the 1990 Honda motorcycle and traveled together to as many as ten motorcycle rallies a year. Most of this travel was paid for from their personal joint funds.
The marriage was not without its share of problems. In 1986 and 1987, Pete had an adulterous affair with a married woman. Linda insisted that Pete break off the relationship, but Pete resisted and maintained contact with his paramour. In July of 1992, after a hiatus in their relationship, Pete secretly contacted his paramour and began calling her frequently. After a period of time, Pete began openly expressing his love for the other woman. After Linda became aware of the renewed relationship, Pete moved out of the marital home on December 4, 1992.

DISCUSSION OF ISSUES
I. DID THE CHANCELLOR ERR BY DENYING THE WIFE LUMP SUM ALIMONY?
II. WAS THE AMOUNT OF PERIODIC ALIMONY INADEQUATE?
III. DID THE CHANCELLOR ERR IN HIS DECISION REGARDING HOUSE PAYMENTS?
IV. DID THE CHANCELLOR ERR BY DENYING THE WIFE ATTORNEY'S FEES?
On cross-appeal the issue is:
V. WAS THE CHANCELLOR'S AMOUNT OF PERIODIC ALIMONY EXCESSIVE?

A. Issues
The four issues presented by the wife in this domestic appeal focus upon the denial of lump sum alimony; the inadequacy of periodic alimony; the chancellor's deviation from the written consent agreement with respect to house payments; and the denial of attorney's fees. The subject matter of husband's cross-appeal is the excessiveness of periodic alimony.

*1122 B. Scope of Review
Our scope of review in domestic relations matters is limited by our familiar substantial evidence/manifest error rule. Stevison v. Woods, 560 So.2d 176, 180 (Miss. 1990).
"This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Bell v. Parker, 563 So.2d 594, 596-97 (Miss. 1990). See also Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994); Faries v. Faries, 607 So.2d 1204, 1208 (Miss. 1992).
In other words, "[o]n appeal [we are] required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." Newsom v. Newsom, 557 So.2d 511, 514 (Miss. 1990). See also Dillon v. Dillon, 498 So.2d 328, 329 (Miss. 1986). This is particularly true in the areas of divorce, alimony and child support. Tilley v. Tilley, 610 So.2d 348, 351 (Miss. 1992); Nichols v. Tedder, 547 So.2d 766, 781 (Miss. 1989). The word "manifest", as defined in this context, means "unmistakable, clear, plain, or indisputable." Black's Law Dictionary 963 (6th ed. 1990).

I. DID THE CHANCELLOR ERR BY DENYING THE WIFE LUMP SUM ALIMONY?
Linda contends the denial of lump sum alimony was "unjust, oppressive and so grossly inadequate as to be an abuse of discretion, and must be reversed." She invites this Court to render judgment in her favor and make "a more equitable distribution of assets."
The chancellor did not award any lump sum alimony. Nor did he elect to make an equitable division of Pete's future retirement benefits derived from his 401K plan and his employees pension plan with Nabisco, which had approximate values of $50,000 and $104,000, respectively.
Linda's post-divorce package included exclusive use, ownership, and possession of the marital home and three acres valued between $64,750 and $95,000; the Ford Explorer valued between $17,000 and $18,000; the John Deere tractor valued between $7,000 and $10,000; the household furniture and appliances valued from $6,500 to $35,000; the Nabisco stock valued at $800; $4,600 in a savings account; her guns valued at $1,000, and certain Nabisco collectibles. In addition, the chancellor ordered Pete to maintain Linda on his medical insurance for a period of three years. The total value of Linda's package ranges from $101,650 to $164,400 minus the payoff on the home mortgages which is approximately $43,000.
Pete's post-divorce package consisted of the 1990 Honda motorcycle valued between $7,000 and $10,000; his guns, personal tools, and recreational equipment (golf clubs, golf cart, & weight bench) valued at $2800; his 401K retirement account worth $50,000 and the $104,000 contained in his pension account with Nabisco. Pete testified that under certain conditions of hardship, he could withdraw up to $34,000 from his 401K account. At the time of the divorce, Pete's RJR Nabisco Employees Pension Plan would pay him $2,584 a month at age sixty-five. The total value of Pete's package ranges from $163,800 to $166,800, the great bulk of which ($154,000) is Pete's interest in his future retirement benefits.
As a practical matter, Linda was awarded all of the tangible assets save for the Honda motorcycle, recreational equipment, personal tools, and interest in Pete's retirement benefits. This disparity in the distribution of tangible assets was apparently the reason behind the chancellor's decision not to award any lump sum alimony.
We have often stated that "[w]hether to award alimony, and the amount to be awarded, are largely within the discretion of the chancellor." Smith v. Smith, 614 So.2d 394, 397 (Miss. 1993) (quoting Cherry v. Cherry, 593 So.2d 13, 19 (Miss. 1991)). See also Gammage v. Gammage, 599 So.2d 569, 572 (Miss. 1992). "[T]he amount of an alimony award is a matter to a great extent within the discretion of the chancery court because of its peculiar opportunity to sense the equities of the situation before it." Holleman v. Holleman, 527 So.2d 90, 94 (Miss. 1988), citing Wood v. Wood, 495 So.2d 503 (Miss. 1986).
*1123 "The chancery court's decision on alimony will not be disturbed on appeal unless it be found against the overwhelming weight of the evidence or manifestly in error." McNally v. McNally, 516 So.2d 499, 501 (Miss. 1987) (citing Harrell v. Harrell, 231 So.2d 793 (Miss. 1970)). Lump sum alimony "is a settlement between the husband and the wife as to the interest of the latter in his property, and as to the extent of the husband's duty to contribute to her maintenance and support." Retzer v. Retzer, 578 So.2d 580, 591 (Miss. 1990) quoting Miller v. Miller, 173 Miss. 44, 64, 159 So. 112, 119-20 (1935)).
A chancellor has the authority in a divorce proceeding to award lump sum alimony in conjunction with periodic alimony. Bush v. Bush, 451 So.2d 779 (Miss. 1984). As noted in Tilley v. Tilley, supra, 610 So.2d 348, 351 (Miss. 1992), "[t]his Court has long recognized the discretionary authority of the chancery court to award lump sum alimony."
About the time of the separation, Linda withdrew $6,600 from joint accounts. She claims $2,000 of that amount was later redeposited and channeled to Pete. The chancellor treated this withdrawal as a form of lump sum alimony. After consideration of this and other facts, he opined: "For these reasons and based on the facts in the case, I do not think any form of lump-sum alimony is appropriate in any way in this case, and I do not believe that Ms. Magee has, nor should I give her, any interest in the 401K plan of Mr. Magee. I do not give her any specific interest in the pension plan with Nabisco, insofar as lump-sum alimony, but I will put and do put a lien on the pension plan to cover the periodic alimony that I am fixing to discuss."
In White v. White, 557 So.2d 480, 483 (Miss. 1989), we listed several factors to be considered by the chancellor in determining whether or not to award lump sum alimony and the amount of the award. These factors, commonly referred to as the "Cheatham" factors, are also found in Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss. 1988). Additionally, a spouse who has made a material contribution toward the acquisition of an asset titled in the name of the other spouse may claim an equitable interest in such jointly accumulated property. Jones v. Jones, 532 So.2d 574, 580-81 (Miss. 1988).
There can be no doubt that during a majority of the parties' seventeen year marriage, Linda worked and made financial contributions to the household for which she can receive credit. With their combined income and the absence of children, the parties were able to travel and live a better than average lifestyle. With Pete's encouragement, Linda spent most of her 401K and USF & G severance funds for the benefit of the household, thus making the couple debt free. Pete, on the other hand, testified that he made no withdrawals from his retirement funds.
Although Linda had an annual earning capacity of at least $20,000, her income two weeks after the trial would be zero. Linda was awarded the marital home and three acres of land, all furnishings in the marital home, the John Deere tractor and all yard equipment and implements, the 1992 Ford Explorer which was paid for, $4,600 in a savings account, and stock valued at $800.
The only tangible assets awarded to Pete were the Honda motorcycle valued at $10,000, and guns, tools, and recreational equipment valued at $2,800. Pete's future retirement benefits valued at $50,000 and $104,500 were untouched by the chancellor's awards. Only Pete's future retirement benefits give him the edge in the worth of the parties' separate estates. Although Linda does not have an income at the present time, we simply cannot say her separate estate is "meager" by comparison with the estate of Pete. Almost all of the tangible assets are now in Linda's possession, and in the future she will receive forty percent of Pete's take-home pay which favors Pete.
The chancellor premised his awards to Linda, in part, on the fact that her present income would be zero after two more weeks of temporary employment at minimum wage and her future retirement benefit "is quite paltry providing her only with $152.56 a month, beginning at age 65." With Pete's encouragement, Linda spent her 401K and severance funds for the benefit of the household. Even after Pete pays $1,600 a month periodic alimony, he has ample funds for *1124 reasonable expenses, and his retirement benefits are fully intact. The proverbial bottom line is that while Linda was working and contributing financially to the family household, Pete built up more than $104,000 in his Nabisco pension plan and nearly $50,000 in his 401K account. Pete freely acknowledged at trial that both he and Linda were intended beneficiaries of his retirement benefits with Nabisco.
The same four factors identified and discussed in Cheatham and White are applied also in Tilley v. Tilley, supra, 610 So.2d 348, 352 (Miss. 1992), albeit in slightly different verbiage. In denying Linda lump sum alimony, the chancellor stated that he had considered every factor found in the Tilley case.
In reviewing the chancellor's decision, we are constrained by the rule that "[i]n the case of a claimed inadequacy or outright denial of alimony, we will only interfere where the decision is seen to be oppressive, unjust or grossly inadequate so as to evidence an abuse of discretion." Monroe v. Monroe, 612 So.2d 353, 357 (Miss. 1992). Although there is a distinction between alimony and retirement benefits, it is now settled that Pete's pension and 401K monies are marital assets subject to an equitable division upon divorce. Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994).
Mississippi is not a community property state. Nevertheless, many of our recent decisions strongly suggest that the court should make an equitable division of marital assets acquired during the marriage where, as here, the wife has made material contributions to the accumulation of the total wealth of the parties. It seems fundamentally unfair to allow Pete to divorce his wife and remarry another woman and permit the other woman to reap the benefits of the retirement plans acquired for the mutual benefit of Pete and Linda during their seventeen years of marriage. Lest we forget, Linda cashed in her retirement funds and used most of the money to pay household expenses and to extricate the parties from marital debt. Linda's annuity payable at age 65 ($152.56 a month) is paltry compared to Pete's present annuity payable at age 65 ($2,584).
On the other side of the coin, Linda received the bulk of the marital assets, she received approximately $4,400 which she withdrew from joint accounts, and she is the recipient of $1,600 per month in periodic alimony, a substantial amount. Although the chancellor's denial of lump sum alimony does not appear to be so grossly inadequate or oppressive as to amount to an abuse of judicial discretion, we, nevertheless, feel compelled to remand this issue to the chancellor for an evaluation of whether or not Linda, in lieu of lump sum alimony, is entitled to an equitable division of Pete's 401K and Nabisco retirement benefits accumulated after the date of their marriage.
The chancellor stated that he did not believe Ms. Magee had, nor should he give her, any interest in the 401K plan of Mr. Magee. He specifically declined to give to Linda, as lump sum alimony, any specific interest in the Nabisco pension plan. As stated, "[a] spouse who has made a material contribution toward the acquisition of an asset titled in the name of the other may claim an equitable interest in such jointly accumulated property." Jones v. Jones, supra, 532 So.2d 574, 580-81 (Miss. 1988). See also Draper v. Draper, 627 So.2d 302, 305 (Miss. 1993). In resolving this matter, the chancellor, as previously pointed out, should follow the guidelines set forth in Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994).

II. WAS THE AMOUNT OF PERIODIC ALIMONY INADEQUATE?

V. WAS THE CHANCELLOR'S AMOUNT OF PERIODIC ALIMONY EXCESSIVE?
In his cross-appeal, Pete says $1,600 a month in periodic alimony is excessive. Linda, on the other hand, claims in her appeal it's not enough. Linda asks this Court to (1) reverse the chancellor's award of $1,600 per month periodic or continuing alimony, (2) adjudicate that Linda's earning capacity is $22,000 per year, and (3) eliminate the limitation of $12,000 on her earnings.
In his cross-appeal, Pete asks this Court to reduce his monthly alimony from $1,600 a month to $1,000 per month with said amount *1125 including the $680 a month required for mortgage payments. We affirm the chancellor's award of $1,600 per month in periodic alimony but reverse and render the chancellor's decision placing a $12,000 limitation on Linda's annual earnings.
In his "Judgment and Opinion", the chancellor opined:
"I base this sixteen hundred dollars on [Linda's] present income of zero after two more weeks of temporary employment and [Pete's] present income gross of $4,741 per month plus his annual bonuses. Ms. Magee may continue her job search and should she obtain employment, she may earn up to $12 thousand per year without the Court considering such earnings as a material change of circumstances for modification of alimony."
Looking briefly at the usual rules in the ordinary case, we find that the right to an award of periodic alimony flows from the duty of the husband to support his wife. Weiss v. Weiss, 579 So.2d 539 (Miss. 1991). The husband is required to support his wife in the manner to which she has become accustomed, to the extent of his ability to pay. Brendel v. Brendel, 566 So.2d 1269 (Miss. 1990). The value of the wife's assets and income should be determined in order to ascertain her needs to maintain her position in life to which she had become accustomed, and such value is considered by the trial court in assessing both alimony and support. Rudder v. Rudder, 467 So.2d 675 (Miss. 1985).
In other words, in determining the amount of alimony, if any, "[t]he chancellor should consider the reasonable needs of the wife and the husband's right to lead a normal life with a decent standard of living." McEachern v. McEachern, 605 So.2d 809, 813 (Miss. 1992).
We are ever mindful of the rule that "[w]hether to award alimony, and the amount to be awarded, are largely within the discretion of the chancellor." Smith v. Smith, supra, 614 So.2d 394, 397 (Miss. 1993) (quoting Cherry v. Cherry, supra, 593 So.2d 13, 19 (Miss. 1991)); Gammage v. Gammage, supra, 599 So.2d at 572 (Miss. 1992); Wood v. Wood, supra, 495 So.2d at 504 (Miss. 1986). This is true, as stated previously, because of the chancery court's "peculiar opportunity to sense the equities of the situation before it." Tilley v. Tilley, supra, 610 So.2d at 351 (Miss. 1992).
"[T]he chancellor is the judge of the weight and worth of the testimony" in a divorce proceeding. Dubois v. Dubois, 275 So.2d 100, 101 (Miss. 1973). See also Rainey v. Rainey, 205 So.2d 514 (Miss. 1967). In the case at bar, the decision of the chancellor with respect to the award of periodic alimony and its amount received ample support from the testimony of both parties.
We have long recognized there are certain factors which are to be considered by the chancellor in fixing alimony amounts. These factors are set forth in Brabham v. Brabham, 226 Miss. 165, 84 So.2d 147 (1955), where we stated:
The lower court should award reasonable sums for alimony ... in light of conditions as they now prevail, including (1) the health of the husband and his earning capacity; (2) the health of the wife and her earning capacity; (3) the entire sources of income of both parties; (4) the reasonable needs of the wife; (5) the reasonable needs of the child; (6) the necessary living expenses of the husband; (7) the estimated amount of income taxes the respective parties must pay on their incomes; (8) the fact that the wife has free use of the home furnishings and automobile; and (9) such other facts and circumstances bearing on the subject that might be shown on the evidence.
See also Tutor v. Tutor, 494 So.2d 362, 364 (Miss. 1986), and Hammonds v. Hammonds, 597 So.2d 653, 655 (Miss. 1992), where we added additional factors for consideration including fault or misconduct, the age of the parties, and the standard of living of the parties both during the marriage and at the time of the support determination.
The chancellor was provided with testimony on practically every factor set forth in Hammonds v. Hammonds and made findings of fact which we do not find to be manifestly wrong. Application of the so-called Brabham/Hammonds factors to the facts in the case at bar favor Linda, albeit slightly.
*1126 The chancellor was not manifestly wrong in his findings of fact which were supported by substantial and credible evidence. Moreover, a correct legal standard was applied. The court did not abuse its discretion in granting periodic alimony to Linda in the amount of $1,600 per month. Accordingly, both Linda's appeal and Pete's cross-appeal addressing this issue are devoid of merit.
We have concluded, on the other hand, the chancellor was manifestly in error when he effectively limited Linda's earnings to only $12,000 per year. In his ruling the chancellor stated:
I base this sixteen hundred dollars [periodic alimony] on [Linda's] present income of zero after two more weeks of temporary employment and [Pete's] present income gross of $4741 per month plus his annual bonuses. Ms. Magee may continue her job search and should she obtain employment, she may earn up to $12 thousand per year without the Court considering such earnings as a material change of circumstances for modification of alimony. [emphasis supplied]
There is no way, under the particular facts of this case, to anticipate at the present hour Linda's needs when and if she finds a job that pays more than $12,000 annually and no way to determine Pete's ability to pay at that time. We, therefore, reverse and render the chancellor's limitation imposed upon Linda's annual earnings.

III. DID THE CHANCELLOR ERR IN HIS DECISION REGARDING HOUSE PAYMENTS?
Linda contends the chancellor was manifestly wrong in deviating from the agreement between the parties set forth in the consent in writing with respect to mortgage payments on the marital home.
The consent in writing contained the following provision agreed upon by the parties:
"a. Plaintiff shall have exclusive use, ownership and possession of the former marital residence of the parties, and Defendant shall pay, promptly and when due, both the first and second mortgages until such times as Plaintiff remarries or vacates said residence;"
The chancellor deviated from this agreement in that he required Linda to pay her own mortgages but included the amount of the monthly mortgage notes ($680) in his award of periodic alimony. Stated differently, instead of receiving monthly alimony in the amount of $920 a month and having Pete pay two monthly notes totaling $680, the chancellor increased the amount of permanent alimony to $1600 and required Linda to pay her own mortgages.
Linda contends that Miss. Code Ann. § 93-5-2 which governs the granting of a divorce on the grounds of irreconcilable differences, makes no allowance for the chancellor to interfere with, modify, change, correct, add to, subtract from, alter, adjust, or dictate the term of the parties' agreement. Linda takes the position that the chancellor's only power under the statute is to approve or disapprove whatever deal the parties have struck. Pete, on the other hand, argues that the chancellor neither abdicated nor substantially modified the agreement and that if the chancellor did err, he did so harmlessly and to Linda's advantage.
We are compelled to agree with Pete that any error in modifying this portion of the consent in writing was innocuous and beneficial to Linda. The parties agreed that Pete would make the monthly mortgage payments on the marital home awarded to Linda. Pete's obligation via the chancellor's modification simply requires him to pay the mortgage notes indirectly rather than directly. Instead of paying the individual mortgagees, Pete pays the amount of the monthly notes to Linda, and Linda, in turn, pays her own mortgages. Put another way, the monthly mortgage payments are included or subsumed, if you please, in the periodic alimony paid monthly by Pete. It's six of one and a half-dozen of the other.
Linda is the real winner here because after the mortgage is paid off, she still continues to receive permanent alimony in the amount of $1600 a month. Obviously, in the long run this puts more cash in Linda's pocket. We have concluded that any error in modifying the agreement of the parties was harmless, *1127 beneficial to Linda, and does not constitute grounds for reversal.

IV. DID THE CHANCELLOR ERR BY DENYING THE WIFE ATTORNEY FEES?
Linda contends the chancellor abused his discretion in denying her a reasonable attorney's fee. She invites this Court to render judgment in her favor in the sum of $2,510.19 plus a reasonable fee for her representation in this appeal and defense of the cross-appeal.
The question of attorney's fees in a divorce action is a matter largely entrusted to the sound discretion of the trial court. Kergosien v. Kergosien, 471 So.2d 1206, 1207 (Miss. 1985). "If a party is financially able to pay her attorney, an award of attorney's fees is not appropriate." Martin v. Martin, 566 So.2d 704, 707 (Miss. 1990).
The law in Mississippi with respect to attorney's fees is found in Smith v. Smith, 614 So.2d 394, 398 (Miss. 1993), where we stated:
As with alimony, the determination of attorney's fees is largely within the sound discretion of the chancellor. Martin v. Martin, 566 So.2d 704 (Miss. 1990); Devereaux v. Devereaux, 493 So.2d 1310 (Miss. 1986); Kergosien v. Kergosien, 471 So.2d 1206 (Miss. 1985). We are "reluctant to disturb a chancellor's discretionary determination whether or not to award attorney fees and of the amount of [any] award." Geiger v. Geiger, 530 So.2d 185, 187 (Miss. 1988).
We follow the general rule that where "a party is financially able to pay her attorney, an award of attorney's fees is not appropriate." Martin v. Martin, supra, 566 So.2d at 704; Carpenter v. Carpenter, 519 So.2d 891 (Miss. 1988); Harrell v. Harrell, 231 So.2d 793 (Miss. 1970). In Cheatham v. Cheatham, 537 So.2d 435 (Miss. 1988), we held that the chancellor abused his discretion in awarding attorney's fees where there was insufficient evidence in the record to establish the wife's inability to pay. Patte is college educated, physically capable of employment, and owns her own business. Nothing in the record indicates an inability to pay her own attorney's fees. Indeed, she has paid nearly one-half of those fees already. Accordingly, we find that the chancellor did not abuse his discretion in denying Patte's request for attorney's fees.
The chancellor found as a fact that Linda "not only has the ability [to pay her lawyer], she has the funds available, half of which belong to her husband anyway and probably all of them as she has been unemployed since 1991."
The chancellor also found as a fact that the amount of attorney's fees claimed by Linda's attorney was certainly reasonable. He further found as a fact that Linda beat Pete to the bank and withdrew approximately $5,600 from the joint savings account of the parties and $1,900 from the joint checking account. Linda used $1,000 to pay bills, leaving $6,500. Although the exact amounts withdrawn by Linda varied, depending upon which testimony to believe, these factual findings were not manifestly wrong.
In addition, Exhibit 21 reflects that Linda had paid her lawyer at least $450 and had paid $309 out of her personal account for the deposition of Richard Magee. She also had placed $545 in an old joint account to cover her lawyer's retainer. The chancellor specifically found as a fact that Linda had both the ability and the funds to pay her attorney. His fact-finding was not manifestly wrong.
The chancellor applied the rules of law rearticulated by this Court in Smith v. Smith, 614 So.2d 394, 398 (Miss. 1993), to the effect that (1) where a party is financially able to pay her lawyer, an award of attorney's fees is not appropriate and (2) it is an abuse of judicial discretion if the trial judge allows attorney's fees without any proof of the wife's inability to pay. Thus, the chancellor applied the correct legal standard to the issue involving attorney's fees. In the final analysis, we simply cannot find an abuse of judicial discretion in the refusal of the chancellor to award attorney's fees to Linda.

Linda's Request for Attorney's Fees To Defend Cross-Appeal
Linda requested "a reasonable attorney's fee for her representation in this appeal *1128 and defense of the cross-appeal." Linda has neither alleged in her brief nor demonstrated her inability to pay her attorney's fees for this cross-appeal. Accordingly, Linda's request for attorney's fees for her representation in this appeal and her defense of the cross-appeal is denied.

CONCLUSION
In summary, we affirm the chancellor in his $1,600 award of periodic alimony and in his denial of attorney's fees; reverse and render the chancellor's judicial fiat limiting Linda's annual earnings to $12,000, and reverse and remand on the question of whether or not Linda is entitled to an equitable division of Pete's future retirement benefits accumulated after the date of their marriage. Pete's cross-appeal and Linda's request for attorney's fees for her representation in this appeal are denied as well as is her request of attorney's fees for defense of the cross-appeal.
ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART; REVERSED AND RENDERED IN PART. ON CROSS-APPEAL: AFFIRMED.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN and SMITH, JJ., concur.
DAN M. LEE, P.J., concurs in part and dissents in part with separate written opinion joined by McRAE, J.
BANKS, J., concurs in part and dissents in part with separate written opinion.
DAN M. LEE, Presiding Justice, concurring in part and dissenting in part:
I concur with the majority's opinion except for that part which remands this case back to the chancery court for a determination as to whether Linda is entitled to additional lump sum alimony from Pete's retirement accounts. It is my belief that the chancellor equitably divided the marital property in keeping with this Court's dictates enunciated in Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994), and Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994), and therefore, Linda is not entitled to any additional lump sum alimony. Because we cannot say that the chancellor erred in refusing to award Linda further lump sum alimony from Pete's individual 401 K retirement accounts, we should affirm his judgment insofar as it pertains to Pete's individual retirement accounts. Hockaday v. Hockaday, 644 So.2d 446, 448 (Miss. 1994). Accordingly, I concur in part and respectfully dissent in part.
In the case sub judice, the chancellor, after considering all of the marital property available for equitable distribution, awarded the marital home and almost all of the couple's personal property to Linda. Linda received the following: (1) the home and three acres of land; (2) the 1992 Ford Explorer (the down payment was paid by Linda out of her U.S.F. & G. retirement fund); (3) the John Deere tractor; (4) the household furniture (some of which was purchased by Linda when she cashed in her U.S.F. & G. retirement plan); (5) Nabisco stock valued at $800; (5) $4,600 in a savings account (lump sum alimony); (6) her guns; and (7) certain Nabisco collectibles.
The majority places the total value of this award between $102,000 and $164,400 minus the payoff on the first and second mortgages which amounts to approximately $43,000. MaGee v. MaGee, 661 So.2d 1117, 1122. The majority's deduction of $43,000 dollars from the value of Linda's property settlement package is both puzzling and incorrect. Pete, and not Linda, is obligated to pay both the first and second mortgages on the former marital home. MaGee, 661 So.2d at 1120 (Pete is obligated to pay $680 monthly on the first and second mortgages). Therefore, since Pete, and not Linda, is responsible for paying the outstanding $43,000 in mortgages, there is no reason to deduct an amount legally owed and being paid by Pete from the value of Linda's property settlement. Accordingly, the value of Linda's post-divorce property settlement should be valued between $102,000 and $164,400.
In addition to the distribution of marital property, the chancellor ordered that Pete pay Linda approximately $920 per month ($11,040 per year) in periodic alimony. This *1129 sum is to be paid until Linda remarries, dies or until further order of the court. Also, the chancellor awarded Linda the $4,600 in cash that she had withdrawn from the couple's joint accounts as lump sum alimony. Finally, Pete is to pay for Linda's health insurance for three years after the divorce. In addition to these payments, Pete is also paying the $680 first and second mortgages on the home now owned by Linda. All totaled, Pete is paying Linda approximately 40% of his net take home pay; this in addition to the property settlement ordered by the chancellor.
In contrast, Pete received the following: (1) a 1990 Honda Goldwing Motorcycle; (2) his guns; (3) his tools and recreational equipment; and (4) two 401 K retirement plans valued cumulatively at $154,000. The total value of Pete's property settlement was valued between $163,800 and $166,800 (much of which is tied up in non-liquid individual retirement account funds). Depending upon which of the parties' valuations is accepted and when we take into consideration the fact that Pete is paying 40% of his net take home pay to Linda, the property settlement appears to be reasonable.
In Tilley v. Tilley, 610 So.2d 348, 351 (Miss. 1992), this Court recognized that we would not reverse a chancellor's decision as to lump sum alimony unless it constituted an abuse of discretion, relied upon an erroneous legal standard, or was manifestly wrong or against the overwhelming weight of the evidence. See also Johnson v. Johnson, 650 So.2d 1281, 1285 (Miss. 1994); Ferguson, 639 So.2d at 930; McEwen v. McEwen, 631 So.2d 821, 823 (Miss. 1994). Further, we recognized in Tilley that there are four factors that the chancery courts must consider when determining whether a spouse is entitled to lump sum alimony. Id. at 352.
In the case at bar, the majority recognizes that the chancellor considered these four factors in reaching his decision not to award Linda additional lump sum alimony in the form of a specific interest in Pete's 401 K retirement plans. Thus, we cannot say that the chancellor relied on an erroneous legal standard in reaching his decision. Next, the majority recognizes that in light of the other awards given Linda (house, personal property, etc.), the lump sum alimony awarded to Linda is not grossly inadequate or oppressive so as to amount to an abuse of discretion. MaGee, 661 So.2d at 1124. Therefore, the only ground left for reversing the chancellor's decision as to the amount of lump sum alimony awarded must be that the chancellor committed manifest error.
We have recently defined "manifest error" as error that is "unmistakable, clear, plain, or indisputable." Brennan v. Brennan, 638 So.2d 1320, 1323 (Miss. 1994) (quoting Black's Law Dictionary 963 (6th ed. 1990)). In the case at bar, the majority does not hold that the chancellor's decision not to award Linda further lump sum alimony was manifest error. Nor can we say that the chancellor's decision not to award additional lump sum alimony was "unmistakable, clear, plain or indisputable error." Brennan, 638 So.2d at 1323. Therefore, because we cannot say the chancellor's decision was based upon an erroneous legal standard or was an abuse of discretion or was manifest error, we are without authority under our own standards of review, to reverse the chancellor on the issue of lump sum alimony.
In Ferguson, this Court, when discussing distribution of marital property upon divorce opined:
Property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division. Therefore, expert testimony may be essential to establish valuation sufficient to equitably divide property, particularly when the assets are as diverse as those at issue in the instant case. All property divisions, lump sum or periodic alimony payment, and mutual obligations for child support should be considered together. "Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede." LaRue, 172 W. Va. 158, 304 S.E.2d at 334 (Neely, J., concurring).
639 So.2d at 929 (emphasis added).
The majority of this Court in Ferguson recognized that: "[a]limony and equitable *1130 distribution are distinct concepts, but together they command the entire field of financial settlement of divorce." Ferguson, 639 So.2d at 929 (quoting LaRue v. LaRue, 172 W. Va. 158, 304 S.E.2d 312, 334) (1983). This Court has recognized on occasions too numerous to be listed herein that the amount of alimony (both periodic and lump sum) to be awarded a spouse is a matter within the sound discretion of the chancery court and will not be reversed unless an erroneous legal standard was applied or unless the decision is manifestly wrong because of "its [the chancery court's] peculiar opportunity to sense the equities of the situation before it." Holleman v. Holleman, 527 So.2d 90, 94 (Miss. 1988) (quoting Wood v. Wood, 495 So.2d 503)). In the case sub judice, when we review the values of the parties' respective estates and when we factor in Pete's alimony payments (both periodic and lump sum), health insurance payments, and the $680 per month Pete is paying on the first and second mortgages on Linda's home into the financial settlement picture, it is submitted that we cannot say that the chancellor erred in awarding Linda $4,600 in lump sum alimony and refusing to allow Linda an interest in Pete's individual 401 K retirement accounts.
If, upon looking at the record, we cannot say that the chancellor applied an erroneous legal standard, was manifestly wrong, or abused his discretion in awarding lump sum alimony and dividing the marital property, then we are legally obligated to affirm his decision. In the case sub judice, Linda, unhappy with her lot, has invited this Court to micro manage the chancellor. Unfortunately, we have once again accepted this invitation and insured that future litigants will realize that they have nothing to lose in appealing all chancery court decisions to this Court. Accordingly, because we cannot say that the chancellor erred in dividing the marital assets and awarding Linda $4,600 in lump sum alimony, I would affirm that part of the chancellor's decision that holds that Linda is not entitled to any additional lump sum alimony from Pete's 401 K retirement accounts.
McRAE, J., joins this opinion.
BANKS, Justice, concurring in part and dissenting in part:
I agree, with some reluctance, that it is appropriate to reverse and remand for reconsideration of the lump sum alimony and equitable distribution issues in light of recent developments in the case law in that area. That is not to say that it is my view that the chancellor's decision is not defensible under those new developments. I say only that the chancellor should be enabled to look at the circumstances of this case with the recently announced legal principles in mind. I am compelled to write separately, however, to express my dissent as to the gratuitous reversal of that portion of the chancellor's judgment which established that a $12,000 earnings level, standing alone, would not be considered such a change in circumstances as to warrant modification of the periodic alimony ordered.
I write also to note that the question of attorney's fees is but another part of the economic pie to be considered in determining the appropriate distribution of assets. Accordingly, we should not finally dispose of that question while leaving the property distribution question open.
At the time that this decree was entered, Linda Magee was employed at a rate of approximately $12,000 per year. While that job was due to expire, there is nothing to suggest that it would be impossible for her to obtain similar employment at this level. In an obvious effort to avoid further expense and rancor for the parties in futile pursuits, the chancellor made it clear that he would not consider employment at that level on the part of Linda, a change in circumstances.
In other words, periodic alimony was established on facts which included an assumption on the part of the chancellor that Linda might supplement her income by earnings in an amount up to $12,000 per year, despite the fact that at the time her immediate earnings would soon be zero. The chancellor did not, as the majority asserts, "effectively limit" Linda's earnings to $12,000. On the contrary, the chancellor protected Linda from a claim of a change in circumstances should she earn up to that amount. Should she earn *1131 more, the question whether there has occurred a change in circumstances sufficient for a modification in periodic alimony would be one which Richard would be free to raise.
Presumably, the court would consider the claim in light of all circumstances existing at that time. Absent such a provision, Richard might, conceivably, file for a modification upon learning that Linda was earning an extra $100 per week or some other similar sum from part-time employment. While Richard is not now precluded from claiming a change in circumstances while Linda earns less than $12,000, the court simply says, as I read it, that earning up to that amount shall not be considered a change in and of itself.
Linda asserts that her earning capacity is $22,000 and, presumably that she should be allowed to earn at least that much before a change of circumstances is considered. The short answer to that is she was not earning $22,000 at the time and, obviously, the chancellor did not set the level of alimony with that level of earnings in mind. To be sure, the chancellor could have done so. On the record, however, it was not an abuse of discretion to do so. In my view, the provision is a reasonable one, well within the discretion of the chancellor and not contrary to any law. I would affirm as to that provision.