IRVING, J.,
 

 for the Court.
 

 ¶ 1. The Hinds County Chancery Court granted Bettye Richardson Atkinson a divorce from Robert Edgar Atkinson Jr. on the ground of adultery. Additionally, the chancellor divided the marital estate and granted Bettye, inter alia, exclusive use, possession, title, and ownership of the marital home, together with the 32.5 acres of land upon which it is situated. Feeling aggrieved, Robert appeals and asserts: (1) that the chancellor erred in finding that Bettye proved the grounds of uncondoned adultery and cruel and inhuman treatment and (2) that the chancellor erred in awarding Bettye the marital home.
 

 ¶ 2. We find that the chancellor properly granted Bettye a divorce but not on the ground of adultery. We also find that the chancellor did not err in awarding the marital home to Bettye and that Bettye proved that she was entitled to a divorce on the ground of habitual cruel and inhuman treatment. Therefore, we modify the judgment to reflect that the divorce is granted on the ground of habitual cruel and inhuman treatment and affirm the judgment of divorce as modified.
 

 FACTS
 

 ¶ 3. Robert and Bettye were married on May 24, 1975, and two children were born to this union: Melanie Aileen, born January 7, 1980, and Robert Kyle (Kyle), born January 2, 1983. The parties separated in September 2004, and Bettye moved out of the marital home the following month. In May 2005, Bettye filed a complaint for divorce on the ground of habitual cruel and inhuman treatment. She later amended her complaint to allege uncondoned adultery as an additional ground for divorce. Thereafter, a petition for emergency relief was filed, and a hearing was held on August 4, 2005. Following the conclusion of the hearing, the chancellor issued a temporary order granting Bettye exclusive use and possession of the marital home and of the surrounding land. The chancellor also ordered Robert to surrender his keys to the marital home.
 

 ¶ 4. The case went to trial on January 29, 2007. The chancellor heard testimony from Bettye, Robert, Melanie, and Patricia Hughes, one of Bettye’s sisters. Bettye testified that her marriage to Robert had been rocky for many years and that she often endured cruel treatment from Robert who suffers from bipolar disorder. Bettye related incidents of abuse that began early in their marriage and continued throughout the course of the marriage. Bettye testified that she remains puzzled as to the cause of some of the incidents of abuse.
 

 ¶ 5. Bettye recalled an incident that occurred during her pregnancy with her
 
 *174
 
 daughter, Melanie. According to Bettye, she and Robert were in their car in the driveway of their home when Robert started choking her. Bettye testified that she did not recall what precipitated the incident and that, at that time, she could not understand why it had occurred.
 

 ¶ 6. Bettye also recalled an incident that occurred when Melanie was in the second grade. She stated that Melanie had asked Robert to assist her with a science fair project two weeks before it was due. Bettye testified that Robert assured Melanie that he would help her. However, according to Melanie, Robert waited until the day before the project was due to offer his assistance. Bettye testified that while Melanie and Robert were working on the project, Melanie became sleepy, causing Bettye to mention several times that Melanie needed to go to bed. According to Bettye, at that point, Robert put a knife to her breast and pushed it into her flesh. Bettye testified that she did not move out of fear that Robert would hurt her, even though she did not call the police.
 

 ¶ 7. Bettye also testified about an incident that occurred around 1996 that involved her and her son, Kyle. Bettye stated that she and Kyle undertook a project to extend the carport at the house and that, one night while they were working, Robert came out of the house, shined a light on them, and began cursing at them. Bettye testified that she did not understand why Robert became angry.
 

 ¶ 8. Further, Bettye recalled an incident that occurred shortly after the carport incident. She testified that she and the children were raking pine needles into piles in their backyard and that Robert set the piles on fire and then left and went inside the house. Bettye further testified that the fire got out of control and started moving in the direction of an old car that was parked in their backyard. Bettye stated that as she and the children worked frantically to extinguish the fire, Robert came back outside and became angry when it appeared as though the fire was going to reach the car. Bettye testified that Robert then grabbed a rake, broke it in half, and acted as if he were going to hit her with it. Bettye recalled that Kyle jumped in between her and Robert and that he told Robert that he would kill him if he hit Bettye.
 

 ¶ 9. Bettye also stated that in either 1997 or 1998, she fled to her sister’s house after Robert became upset about something (she did not say what). Bettye testified that Robert left the house and returned drunk.
 
 [1]
 

 ¶ 10. Bettye testified about an incident that occurred in September 2004. According to Bettye, their mobile home was burglarized, and during the burglary, clothes were strewn around their bedroom. Bettye stated that their bedroom was still in disarray about two days later, and as a result, Robert became angry and began cursing at her. Bettye further stated that Robert informed her that he wanted a divorce. Bettye recalled that during this altercation, Robert grabbed her, threatened to physically throw her out of the mobile home, and threatened to rape her. Specifically, Bettye stated that Robert dragged her into their bedroom and tore her clothes off. However, Bettye stated that Robert’s threat did not materialize. According to Bettye, Robert later apologized. Bettye offered pictures at trial that, according to her, depict bruises from
 
 *175
 
 this incident.
 
 [2]
 

 ¶ 11. In 1987, Bettye’s mother deeded her and her sisters 110 acres of land and an old home. Around 1998, the land was divided, and Bettye’s sisters added their husbands’ names to their deeds. Bettye stated that she decided against adding Robert’s name to her deed at that time because they were experiencing marital problems and because the land had been in her family well over one hundred years. Bettye also stated that Robert refused to spend any money on the property until his name was added to the deed. Therefore, despite her initial reluctance, Bettye added Robert’s name to the deed in 1998.
 

 ¶ 12. Bettye testified that in either late 2002 or early 2003, she and Robert purchased a mobile home for $80,000 and placed it on the 32.5 acres of land.
 
 [3]
 
 According to Bettye, they moved into the mobile home and lived there for a year and one month before they separated.
 

 ¶ 13. Melanie also testified and painted a picture of what life was like growing up in the Atkinson household. According to Melanie, during the course of her childhood, her father routinely exhibited behavior that she characterized as threatening. She testified that, as a child, she was often fearful of her father and recalled that she, her mother, and her brother constantly felt as though they had to walk on eggshells. Melanie stated that her father was very mean to her mother, who, she stated, was always ready, willing, and able to do what was necessary to keep peace in their household. Further, Melanie characterized her father’s love as conditional. She explained that he acted as though he loved her when she did things his way, but she stated that when she did not, she “just kind of got left behind.” Melanie testified that a major point of contention in her parent’s marriage involved the land that was deeded to her mother and the fact that her mother did not initially add her father’s name to the deed.
 

 ¶ 14. Patricia testified that she has known Robert for many years and described his and Bettye’s relationship as volatile. According to Patricia, Robert would belittle Bettye “every opportunity he would get, ... whether he was in a room full of people or just one person.... ” She further stated, “I don’t know what happened [when they were] alone, you know, obviously, but he just made it very uncomfortable for anyone to be around them together.”
 

 ¶ 15. Robert also testified during the divorce proceedings and admitted that he lives with a female friend and her sister and that he suffers from bipolar disorder, which he manages by taking nine-hundred milligrams of lithium per day. However, Robert denied inflicting the bruises upon Bettye that are reflected in the photographs that were introduced during the trial. He also stated that, although it bothered him that Bettye did not add his name to the deed when her sisters added their husbands’ names, he did not coerce Bettye into adding his name to the deed. Robert stated that he merely informed Bettye that he would not perform any work on the property as long as his name was not on the deed. Robert recalled that thereafter, on his birthday, Bettye presented him with a deed that had his name
 
 *176
 
 listed on it. Robert testified that he and Bettye spent between $100,000 and $140,000 in marital funds on improvements to the property, including installation of a water treatment system.
 
 [4]
 

 ANALYSIS AND DISCUSSION , OF THE ISSUES
 

 ¶ 16. “In domestic relations cases the scope of review is limited by the substantial evidence/manifest error rule.”
 
 Hensarling v.
 
 Hensarling, 824 So.2d 583, 586(¶ 7) (Miss.2002) (citing
 
 Magee v. Magee,
 
 661 So.2d 1117, 1122 (Miss.1995)). An appellate court will reverse a chancellor’s finding of fact only in cases where the record lacks substantial evidence to support a finding.
 
 Id.
 
 (citing
 
 Henderson v. Henderson,
 
 757 So.2d 285, 289(¶ 19) (Miss.2000)). The
 
 Hensarling
 
 court also held that “[an appellate court’s] scope of review in domestic relations matters is limited under the familiar rule that [an appellate court] will not disturb a chancellor’s findings unless manifestly wrong, clearly erroneous, or if the chancellor applied an erroneous legal standard.”
 
 Id.
 
 (quoting
 
 Johnson v. Johnson,
 
 650 So.2d 1281, 1285 (Miss.1994)). -
 

 ¶ 17. Robert contends that Bettye did not prove that she is entitled to a divorce on the ground of either adultery or cruel and inhuman treatment. In his “Opinion of the Court,” the chancellor states that “[i]n his own testimony at trial, [Robert] acknowledged that he had moved from the marital domicile in 2004 and set up house-keeping with his paramour in Clinton. On [Robert’s] own admission of adultery, the Court finds that Bettye is entitled to a divorce on the ground of uncondoned adultery.”
 

 ¶ 18. Our review of the record leads us to conclude that the chancellor mischarac-terized Robert’s testimony. ' On this point, the trial transcript contains the following exchange between Robert and Bettye’s attorney:
 

 Q. Okay. Where do you currently reside?
 

 A. I reside at 108 Maudedith Lane in Clinton, Mississippi.
 

 Q. Who lives there with you?
 

 [ATTORNEY FOR DEFENDANT]:
 

 Objection. Relevancy.
 

 THE COURT: Overruled.
 

 A. I live there with some friends.
 

 Q. Who are they?
 

 A. Linda Roby and Nicole Roby.
 

 Q. Okay. And Linda Roby is your current girlfriend. Is that correct?
 

 A. Linda Roby is a friend that I live with because my house was uprooted out from under me and I had no place to stay.
 

 Q. Have you ever had sex with her?
 

 [ATTORNEY FOR DEFENDANT]:
 

 Objection. Relevancy.
 

 [ATTORNEY FOR PLAINTIFF]:
 

 Your Honor, he’s circumventing my questions.
 

 ¶ 19. As evidenced by the colloquy, Robert’s attorney objected before Robert could answer the question of whether he had ever had sexual intercourse with Linda. Furthermore, we have scoured the record and have not found any other point in the hearing where adultery was discussed. We recognize that Robert’s admission that he lived with another woman could lead one to presume that the two were involved in a sexual relationship. However, simply because Robert lived
 
 *177
 
 ■with a person of the opposite sex does not prove by clear and convincing evidence that he committed adultery, especially when there was no testimony about their sleeping arrangements. It is also significant that Linda’s sister resided in the home with Robert and Linda.
 

 ¶ 20. The Mississippi Supreme Court has held that “[a] charge of adultery may be grounds for divorce upon a showing of either an infatuation for a particular person of the opposite sex or a generally adulterous nature on the part of the defendant.”
 
 Holden v. Frasher-Holden,
 
 680 So.2d 795, 798 (Miss.1996) (quoting
 
 McAdory v. McAdory,
 
 608 So.2d 695, 700 (Miss.1992)). The
 
 Holden
 
 court also held that “[t]here must be evidence of one or the other before a divorce may be granted on these grounds.”
 
 Id.
 
 Further, it is well established in Mississippi that a person “seeking a divorce on the grounds of adulterous activity must show by clear and convincing evidence both an adulterous inclination and a reasonable opportunity to satisfy that inclination.”
 
 Id.
 
 (quoting
 
 Dillon v. Dillon,
 
 498 So.2d 328, 330 (Miss.1986)).
 

 ¶ 21. Although we acknowledge that the opportunity for Robert to commit adultery may have existed, the record is devoid of any evidence regarding inclination or an infatuation with Linda, as the quoted passage is the only evidence which sheds any light on Robert’s relationship with Linda. Thus, we conclude that because the record does not support the chancellor’s finding that Robert admitted to having had a sexual relationship with Linda, substantial evidence does not exist to support his finding that Robert committed adultery, thereby entitling Bettye to divorce on this ground.
 

 ¶ 22. Nevertheless, we conclude that substantial evidence does exist to support a finding that Bettye is entitled to a divorce on the ground of habitual cruel and inhuman treatment.
 
 [5]
 
 On this point, we note the following finding by the chancellor:
 

 On [Robert’s] own admission of adultery, the Court finds that Bettye is entitled to a divorce on the ground of uncondoned adultery. The Court would be remiss if it did not also find, for other purposes, that Bettye amply proved her entitlement to a divorce on the ground of habitual cruel and inhuman treatment. ...
 

 Therefore, it is clear to us that the chancellor found that Betty was also entitled to a divorce on the ground of habitual cruel and inhuman treatment, even though the judgment of divorce granted the divorce on the ground of adultery only. Consequently, we affirm the chancellor’s grant of divorce but on the ground of habitual cruel and inhuman treatment, as “[an appellate
 
 *178
 
 court] will generally affirm, even if it finds that the lower court has employed erroneous legal reasoning, provided only that the correct result has been achieved below.”
 
 Gates v. Gates,
 
 616 So.2d 888, 890 (Miss.1993) (quoting
 
 DeFoe v. Great S. Nat’l Bank, N.A.,
 
 547 So.2d 786, 788 (Miss.1989)).
 

 ¶ 28. Robert also argues that the chancellor erred in awarding Bettye the marital home. The chancellor made the following finding as it relates to the marital home:
 

 [A] good portion of the marital estate exists as a result of Bettye’s inheritance of land.
 
 [6]
 
 That property was converted to a marital estate by Bettye when she titled it to herself and [Robert], although it seems clear through the testimony that this prior distribution to him was not entirely voluntary. Both Melanie, the parties!’] daughter, and Patricia Hughes testified that Bob browbeat Bettye for years until she finally relented and put his name on the title, as Patricia said, “to keep peace in the family.”
 

 (Footnote added). The chancellor also found that “Bettye clearly has a far greater emotional attachment to the land, and thus the mobile home on the land, than does [Robert].”
 

 ¶ 24. Robert argues that despite the fact that the property was deeded to Bettye from her parents, the chancellor should have considered his equally strong attachment to the property. Robert contends that this is reflected by his and Bettye spending a little over one-hundred thousand dollars in marital funds on the property and by the work that he performed on the property to get it to a more usable condition. There is nothing in the record which leads us to conclude that the chancellor’s decision, as it relates to the marital home, is not supported by substantial evidence. Further, the chancellor heard testimony and thoroughly considered the
 
 Ferguson
 
 factors before dividing the marital estate.
 
 [7]
 
 Accordingly, we find no merit to this issue.
 

 ¶ 25. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS AFFIRMED AS MODIFIED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ„ CONCUR.
 

 [1]
 

 . Bettye also stated that there was a ten-year period of time that Robert stopped drinking, but she stated that the abuse continued.
 

 [2]
 

 . Robert’s attorney pointed out on cross-examination that the pictures were dated September 15, 2005, and that during that time, Bettye and Robert were separated. Bettye responded that, while preparing for trial, she had written the wrong year on the pictures and that the incident occurred on September 15, 2004, rather than on September 15, 2005.
 

 [3]
 

 . This is the same mobile home that we referenced in paragraph ten.
 

 [4]
 

 . Robert also stated that he spent $20,000, in nonmarital funds, on improvements to the marital property.
 

 [5]
 

 . The Mississippi Supreme Court has held that:
 

 habitual cruel and inhuman treatment [can] be established only by a continuing course of conduct on the part of the offending spouse which [is] so unkind, unfeeling or brutal as to endanger or put one in reasonable apprehension of danger to life, limb or health, and further, that such course of conduct must be habitual, that is, done so often, or continued so long that it may be reasonably said [to be] a permanent condition.
 

 Talbert v. Talbert,
 
 759 So.2d 1105, 1108(¶ 8) (Miss.1999) (quoting
 
 Potts v. Potts,
 
 700 So.2d 321, 323(¶ 11) (Miss.1997)). Further, the
 
 Tal-bert
 
 court held that there must be "more than mere unkindness or rudeness, or incompatibility or want of affection to support a finding of cruel and inhuman treatment."
 
 Id.
 
 (citing
 
 Churchill v.
 
 Churchill, 467 So.2d 948, 951 (Miss.1985)).
 

 Based on Bettye's testimony of the events that have transpired throughout the course of their marriage, we conclude that Bettye proved that Robert's behavior was habitually cruel and inhuman.
 

 [6]
 

 . As previously noted, Bettye did not inherit the land; rather, it was deeded to her by her parents.
 

 [7]
 

 . In
 
 Ferguson v. Ferguson,
 
 639 So.2d 921, 928 (Miss.1994), the Mississippi Supreme Court announced factors that chancellors should consider when dividing marital estates.