970 So.2d 204 (2007)
Patrick Douglas ASHBURN, Appellant
v.
Christine Dale ASHBURN, Appellee.
No. 2006-CA-00554-COA.
Court of Appeals of Mississippi.
November 27, 2007.
*206 Kay Farese Turner, Rachael Emily Putnam, attorneys for appellant.
Christine Dale Ashburn, appellee, pro se.
Before MYERS, P.J., BARNES and ROBERTS, JJ.
BARNES, J., for the Court.
¶ 1. This case comes on appeal from the order of the DeSoto County Chancery Court dismissing Patrick Ashburn's complaint for divorce and ordering Mr. Ashburn to pay all remaining guardian ad litem fees. Because Mrs. Ashburn has not filed a brief and we cannot say with confidence that the chancellor committed no error, we reverse the judgment of the chancery court and remand for proceedings not inconsistent with this ruling.

SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. On March 26, 2002, Patrick Ashburn filed a complaint for divorce in the DeSoto County Chancery Court. Mr. Ashburn alleged in his complaint that he and Christine Dale Ashburn were legally married on July 27, 1989, and cohabited together as husband and wife until approximately March 2, 2002. At such time, according to Mr. Ashburn's complaint, the parties physically terminated their marital relationship. The complaint further alleged that one *207 minor child by the name of Patrick Douglas Ashburn, Jr. ("P.J.") was born as a result of the marriage. Mr. Ashburn alleged that he was entitled to a divorce from Mrs. Ashburn based on the grounds of habitual cruel and inhuman treatment and habitual and excessive use of opium, morphine or other like drug, both pursuant to Mississippi Code Annotated Section 93-5-1 (Rev.2004). Mr. Ashburn sought an absolute divorce; custody of and support for the couple's minor child, both temporary and permanent; and an equitable division of all marital property.
¶ 3. Following the filing of the complaint for divorce and the perfection of service upon Mrs. Ashburn, Mr. Ashburn filed a motion for default judgment based on Mrs. Ashburn's failure to file an answer to the complaint. On May 9, 2002, Mrs. Ashburn filed an answer, wherein she generally denied that Mr. Ashburn was entitled to a divorce but did not raise any affirmative defenses. On July 15, 2002, the chancery court entered a temporary order nunc pro tunc to May 20, 2002, whereby the parties were given joint legal custody of the minor child with physical custody to be equally divided in one-week intervals in the parties' marital home. The order also prohibited the use of alcohol or drugs in the presence of the child and ordered that no temporary child support would be paid by either party.
¶ 4. On September 20, 2004, Mr. Ashburn filed a Rule 35 motion for physical and mental examination of Mrs. Ashburn, a motion for appointment of guardian ad litem, a motion to modify temporary order and grant plaintiff temporary sole physical and legal custody of the parties' minor child, and a motion for exclusive use of the marital residence. On the same date, Mr. Ashburn also filed a petition for citation of criminal and civil contempt, wherein he alleged that Mrs. Ashburn had violated the court's order by continuing to abuse drugs and prescription narcotics. On October 22, 2004, the parties entered into a consent order whereby a guardian ad litem was appointed. On September 1, 2005, Mr. Ashburn filed an emergency petition seeking a temporary restraining order; designation as sole physical and legal custodial parent of the minor child; and enforcement of the guardian ad litem's recommendations.
¶ 5. On October 4-6, 2005, the trial was held in this matter. The evidence adduced at the trial was as follows:
¶ 6. Patrick Ashburn and Christine Dale Ashburn were married on July 27, 1989, and had their only child on April 4, 1991. Mrs. Ashburn had one child from a previous relationship, Emily Augustine, whom Mr. Ashburn raised from infancy. Mr. Ashburn testified that throughout the course of the marriage, Mrs. Ashburn's drug use continually got worse. He stated that she was taking illegal drugs and prescription drugs. According to Mr. Ashburn, Mrs. Ashburn would go from one doctor to another trying to obtain Oxycontin and other drugs, and she would then take such drugs in excess of the recommended dosage. Mr. Ashburn testified that, in early 2002, Mrs. Ashburn was abusing drugs and that, at one point, she went with a friend to a birthday party and did not return for six weeks. Mr. Ashburn stated that, after he filed for divorce in March of 2002, Mrs. Ashburn entered rehab for approximately six weeks.
¶ 7. Mr. Ashburn testified that he and Mrs. Ashburn eventually moved back in together in their marital home in August of 2002 and that during this time he was doing all that he could to try to rehabilitate the marriage. He stated that he did so for the best interest of the children. He further testified that, although he and Mrs. Ashburn were sleeping in the same *208 bed at times[1], the two were not having sexual relations other than one time in 2003. He also testified that, since 2000, Mrs. Ashburn had been in rehab at least three times, but that none of these stints in rehab resulted in Mrs. Ashburn's conquering her drug addiction. According to Mr. Ashburn, following the time he moved back into the marital home, Mrs. Ashburn was self-medicating with her prescription drugs and taking such drugs in excess of the amount prescribed by her doctor. He further stated that this was occurring in the latter part of 2003, after the time he last had sexual relations with Mrs. Ashburn. He stated that Mrs. Ashburn continued to increase her drug dosages and that she started getting three month's worth of pills in a month through his insurance from work.[2] Mr. Ashburn testified that the last time Mrs. Ashburn was in rehab was in February of 2004 due to her excessive use of prescription drugs. He stated that Mrs. Ashburn overdosed in the presence of P.J. and Emily sometime around January of 2004.
¶ 8. Mr. Ashburn testified that Mrs. Ashburn promised him after he filed for divorce that she would stop using drugs but that she had not lived up to her promise. He stated that Mrs. Ashburn entered a manic state in March 2005, during which time she was yelling at one time and sitting on the couch and drooling at another time. Mr. Ashburn further stated that, at this time, Mrs. Ashburn was extremely over-medicated and in his opinion she was in a drug-induced state. He testified that he moved out of the couple's marital home again in June of 2005. Mr. Ashburn testified that Mrs. Ashburn had forged his name on checks written to a pharmacy and that she was facing forgery charges. According to Mr. Ashburn, Mrs. Ashburn worked periodically during the marriage, and when she was working at a catfish restaurant, the owners of the restaurant and Mrs. Ashburn were doing drugs. He also stated that Mrs. Ashburn worked part-time at a day care where her mother also worked.
¶ 9. Denean Francis, a family friend of Mr. and Mrs. Ashburn who admitted to using drugs herself in the past, testified that she saw Mrs. Ashburn snort Oxycontin through her nose in approximately 1994 or 1995, and that she believed she had observed Mrs. Ashburn under the influence of drugs between the years of 2001 and 2005. Ms. Francis testified that she believed she had witnessed Mrs. Ashburn under the influence of drugs on the day prior to Ms. Francis's testimony. She also testified that, on December 18, 2003, Mrs. Ashburn stole a written prescription for Lortab from her home and had it filled at the pharmacy.[3] According to Ms. Francis, Mrs. Ashburn told her that she stole the prescription so that she could commit suicide. Ms. Francis also admitted to smoking marijuana recreationally and to smoking marijuana as recently as the night before her testimony, but she stated that, on the night before, she smoked the marijuana *209 for medical reasons.[4]
¶ 10. Lieutenant Bobbie Jones, an employee of the Olive Branch Police Department trained in narcotics investigation and a friend of Mr. Ashburn, testified that, two or three years prior to the trial, he had been called to the Ashburns' home due to a domestic disturbance, specifically Mrs. Ashburn's claim that Mr. Ashburn had physically intimidated her. Lt. Jones testified that, when he arrived at the home, Mrs. Ashburn's pupils were "blown" and her speech was extremely slurred. He stated that, in his professional opinion, Mrs. Ashburn was under the influence of a central nervous system depressant. He stated that, at the time, he attributed most of her condition to the medication that she was on due to her medical condition. Lt. Jones further testified that he had visited Mrs. Ashburn's home approximately twenty times in the past twelve months and that he observed Mrs. Ashburn under the influence of drugs fifteen out of these twenty times.
¶ 11. Mrs. Ashburn's mother, Christine Isbell, testified that from August of 2002 until July of 2005, Mr. and Mrs. Ashburn and the children were living together as a family. Ms. Isbell further testified Mrs. Ashburn suffers from bipolar disorder and rheumatoid arthritis and that she was aware that her daughter had a drug abuse problem to an extent, but only specifically recalled one incident when Mrs. Ashburn was prescribed Oxycontin, was unable to take the drug correctly, and then checked herself into rehab; and another incident in which she overdosed and was admitted to the ICU.
¶ 12. Mrs. Ashburn, testified that, after Mr. Ashburn filed the complaint for divorce in March of 2002, he left their residence for the months of June and July of 2002 and then moved back in August of 2002. She stated that initially the two shared the house week to week, with each leaving the house for the week when the other had custody. According to Mrs. Ashburn, she and Mr. Ashburn had sexual relations after Mr. Ashburn filed for divorce but prior to the time he moved out in June of 2002. She also testified that from August 2002, the time when Mr. Ashburn moved back into the marital residence, to the end of July 2005 when he moved out, the two lived together as man and wife and had sexual relations two or three times a week.
¶ 13. Mrs. Ashburn testified that she was hospitalized for fourteen days in 1998 for an addiction to morphine which had been prescribed by her doctor for rheumatoid arthritis and lupus. However, Mrs. Ashburn stated that she did not abuse the morphine; rather, she was just unable to handle it. Mrs. Ashburn testified that her physician put her on Oxycontin in 2000, but that she did not abuse the drug and that she had no inpatient hospital treatment in 2000. According to Mrs. Ashburn, she admitted herself to the hospital in 2002 for an addiction to Oxycontin because she had started to abuse the drug. She later testified that the last time she had a problem with Oxycontin was late 2001. Mrs. Ashburn testified that she relapsed again in November of 2003 and that she overdosed in February of 2004 on Lortab while trying to commit suicide and was again admitted to the hospital, initially to the ICU in Germantown, Tennessee, and then to Lakeside, at which time she was put on Lithium for bipolar disease.
*210 ¶ 14. Mrs. Ashburn testified that she does not pass out at home in front of the children, but that when she was on morphine she did like to stretch out on the couch and fall asleep. She also testified that, in 2004, her children called Mr. Ashburn and told him that they thought their mother was dying, at which time she made the aforesaid stay in ICU. Mrs. Ashburn testified that she was currently taking the prescription medications Effexor, Lithium, Neurontin, and Klonopin. She further testified that she smoked marijuana in 2001 and that she tested positive for marijuana and hydrocodone in January and May of 2001. She denied, however, that these positive drug test results were the reason her treating physician at the time, Dr. Charlotte Flumere, refused to treat her anymore.[5] She also testified that she did methamphetamines and cocaine at the end of 2001. With regard to the aforementioned forgery charges, she stated that she had permission to sign Mr. Ashburn's checks.
¶ 15. Mrs. Ashburn admitted to stealing Ms. Francis's prescription at the end of 2003 and stated that she did so for the purpose of gathering pills, but denied that it was because of her drug habit. She denied that she had at any time engaged in obtaining drugs from numerous physicians, none of whom had any knowledge of the others' treatment. She also denied that she had been addicted to morphine-type mind-altering drugs for a period of time of more than five years, admitting rather to self-medicating with pain pills since approximately the end of 2000. She testified that the self-medicating ended in 2002, when she went to rehab, but that she relapsed at the end of 2003 for about three months until February of 2004. She then testified that it would be fair to say that she self-medicated from 1999 to 2004, and that the last time she had any pain pills was February 2004. Mrs. Ashburn testified that, in March of 2005, she went manic for approximately three days which caused her doctor to raise her Lithium dosage for a period of time. In May of 2005, the guardian ad litem recommended that Mr. Ashburn and the minor child move out of the marital residence on account of the condition of the house being unfit for the child.
¶ 16. At the beginning of the trial, Mrs. Ashburn moved ore tenus to dismiss the case based on the fact that she did not want a divorce and based on her claim that the parties reconciled after Mr. Ashburn filed the complaint for divorce and proceeded to live together for three years with Mr. Ashburn having full knowledge of Mrs. Ashburn's drug use. Alternatively, Mrs. Ashburn moved in limine to restrict all testimony to only what occurred after August 2005 when Mr. Ashburn moved out of the marital home. The court denied the motion in limine and took the motion to dismiss under advisement until the conclusion of Mr. Ashburn's case. At the close of her case, Mrs. Ashburn reiterated her motion to dismiss and moved for a directed verdict based on condonation. The court denied the motion for directed verdict.
¶ 17. At the completion of the presentation of evidence, the court denied Mr. Ashburn's *211 complaint for divorce without prejudice. The court first found that there was no evidence indicating that Mr. Ashburn had been the subject of cruel and inhuman treatment. With regard to Mr. Ashburn's other ground for divorce, habitual drug use, the court found that there was ample evidence that Mrs. Ashburn had a drug problem, but that everything prior to the last separation in June of 2005 was condoned by Mr. Ashburn through his continuing to cohabit with Mrs. Ashburn and have sexual relations with her. Specifically, the court stated the following:
In this case there was testimony if you believe the husband's testimony of only [one] time of sex since he went back, but one time is one time. Her testimony was that it was two or three times a week. As in anything I'm the trier of the fact [sic] and I would believe that the truth is probably somewhere in between those two figures, more than he says and less than she says, though I cannot and would not try to put an exact number on that. But even one time if I took his testimony would be sufficient to condone the acts until he finally separated from her in June of 2005. The only testimony of any drug use after June of [2005] is the testimony of Lt. Bobby Jones, who said that he saw her under the influence two years ago, but he thought it was because of prescribed meds. And he saw her 15 times in the last year, but in my mind he didn't distinguish whether that was under prescribed meds or whether it was under the type of drugs set forth in the case of Lawson v. Lawson [821 So.2d 142 (Miss. Ct.App.2002)].
¶ 18. Accordingly, the chancellor dismissed Mr. Ashburn's complaint for divorce based on condonation. The chancellor then assessed all of the remaining guardian ad litem fees to Mr. Ashburn, with such fees to be paid on a monthly basis, and awarded sole physical and legal custody of the minor child to Mr. Ashburn. On October 21, 2005, Mr. Ashburn filed a motion to alter or amend the chancellor's ruling, which the chancellor denied.
¶ 19. Aggrieved, Mr. Ashburn appeals arguing that the chancellor erred in allowing Mrs. Ashburn to make an ore tenus motion to dismiss Mr. Ashburn's complaint for divorce based on condonation at the inception of the trial without providing Mr. Ashburn with at least ten days notice of such motion. Mr. Ashburn further contends that the chancellor erred in dismissing his complaint for divorce based on the affirmative defense of condonation when Mrs. Ashburn did not plead condonation. Additionally, Mr. Ashburn appeals the chancellor's finding that he condoned Mrs. Ashburn's habitual drug use through his continuation of sexual relations with Mrs. Ashburn. Finally, Mr. Ashburn appeals the chancellor's assessment of all of the remaining guardian ad litem fees to him. We agree that the chancellor erred in denying Mr. Ashburn a divorce. We disagree that the chancellor erred in assessing all of the remaining guardian ad litem fees to Mr. Ashburn. Thus, we affirm in part and reverse and remand in part.

STANDARD OF REVIEW
¶ 20. "In domestic relations cases the scope of review is limited by the substantial evidence/manifest error rule." Jundoosing v. Jundoosing, 826 So.2d 85, 88(¶ 10) (Miss.2002) (citing Magee v. Magee, 661 So.2d 1117, 1122 (Miss.1995)). "This Court may reverse a chancellor's findings of fact only when there is no `substantial credible evidence in the record' to justify his finding." Id. (quoting Henderson v. Henderson, 757 So.2d 285, 289(¶ 19) (Miss.2000)). "`Our review in domestic relations is limited under the familiar rule that this Court will not disturb *212 a chancellor's findings unless manifestly wrong, clearly erroneous, or if the chancellor applied an erroneous legal standard.'" Id. (quoting Johnson v. Johnson, 650 So.2d 1281, 1285 (Miss.1994)).
¶ 21. In the case sub judice, Mrs. Ashburn did not file a brief in response to Mr. Ashburn's appeal. The "`[f]ailure to file a brief is tantamount to confession of error and will be accepted as such unless the reviewing court can say with confidence, after considering the record and brief of [the] appealing party, that there was no error.'" Sanders v. Estate of Chamblee, 819 So.2d 1275, 1277(¶ 5) (Miss.2002) (quoting Dethlefs v. Beau Maison Dev. Corp., 458 So.2d 714, 717 (Miss. 1984)). "`Where the appellant's brief makes out an apparent case of error . . ., we do not regard it as our obligation to look to the record to find a way to avoid the force of the appellants' argument.'" Id.

DISCUSSION
I. Did the chancellor err in dismissing Mr. Ashburn's complaint for divorce based on the affirmative defense of condonation when Mrs. Ashburn did not plead such defense?
¶ 22. Mr. Ashburn argues that the chancellor erred in dismissing his complaint for divorce based on the defense of condonation when Mrs. Ashburn did not plead condonation in her answer. Mr. Ashburn contends that, in a divorce action, condonation is an affirmative defense that must be specifically pled by the party asserting it or else the defense is waived.[6]
¶ 23. Mississippi Rule of Civil Procedure 8(c), which governs affirmative defenses, states as follows:
In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, latches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense.

M.R.C.P. 8(c) (emphasis added). "Affirmative defenses that are neither pled nor tried by consent are deemed waived." Goode v. Village of Woodgreen Homeowners, 662 So.2d 1064, 1077 (Miss.1995). It is undisputed in this case that Mrs. Ashburn did not plead condonation in her answer; nor did she amend her answer to plead condonation. Thus, argues Mr. Ashburn, because condonation is an affirmative defense, Mrs. Ashburn waived her right to rely on such defense.
¶ 24. Although Mr. Ashburn cites no Mississippi case law specifically stating that condonation is an affirmative defense, nor is this Court aware of any such authority, a review of other jurisprudence reveals that it is generally accepted that condonation is an affirmative defense that must be specifically pled. See, e.g., *213 Hancock v. Hancock, 257 Iowa 119, 131 N.W.2d 757, 759 (Iowa 1964) ("[c]ondonation is an affirmative defense which must be pleaded"); Sabia v. Sabia, 16 N.J.Super. 273, 84 A.2d 559, 561 (App.Div.1951) ("[c]ondonation is an affirmative defense and must be pleaded, with the burden resting on the defendant"). Moreover, condonation falls squarely within the definition of an affirmative defense. The Mississippi Supreme Court has defined an affirmative defense as one that "assumes the plaintiff proves everything he alleges and asserts, even so, the defendant wins." Hertz Commercial Leasing Div. v. Morrison, 567 So.2d 832, 835 (Miss.1990). "Conversely, if, in order to succeed in the litigation, the defendant depends upon the plaintiff failing to prove all of part of his claim, the matter is not an avoidance or an affirmative defense." Id. In the case sub judice, even if Mr. Ashburn proves that Mrs. Ashburn habitually and excessively used drugs during their marriage, Mrs. Ashburn might still avoid a grant of divorce if she was able to prove that Mr. Ashburn condoned such drug use.[7] Thus, condonation is an affirmative defense that must be specifically pled or else it is waived.[8]
¶ 25. While the activity upon which Mr. Ashburn's condonation defense is based occurred after Mrs. Ashburn filed her answer, Mississippi Rule of Civil Procedure 15 instructs courts to be liberal in allowing amendments to pleadings. In re Estate of Smith v. Averill, 722 So.2d 606, 610(¶ 8) (Miss.1998) (citing M.R.C.P. 15(a)). Despite being aware prior to the trial in this matter of the facts giving rise to the alleged condonation, Mrs. Ashburn at no time sought to amend her answer to plead the defense of condonation; nor is there any reason to believe that the chancellor would not have allowed such an amendment. Accordingly, Mrs. Ashburn waived the right to rely on the affirmative defense of condonation.
¶ 26. We acknowledge that one could argue that, although Mrs. Ashburn did not plead the affirmative defense of condonation, the defense was tried by Mr. Ashburn's consent. The Mississippi Supreme Court has held that "if evidence is offered by a party which is outside the scope of the pleadings and the other party fails to object, the opponent will be considered to have impliedly consented to the issue and the pleading will be amended accordingly," Lahmann v. Hallmon, 722 So.2d 614, 619(¶ 16) (Miss.1998) (citing Queen v. Queen, 551 So.2d 197, 202 (Miss.1989)). "The failure to formally amend to conform with the evidence `does not affect the result of the trial of these issues.'" Id. (quoting M.R.C.P. 15(b)).
¶ 27. When Mrs. Ashburn moved to dismiss the complaint for divorce based on the fact that she and Mr. Ashburn had lived together as man and wife for a period of three years after the complaint was filed, Mr. Ashburn objected to such motion, but not on the grounds that condonation is an affirmative defense, or at least as much was not articulated.[9] Rather, he objected on the grounds that no motion to *214 dismiss had previously been filed or was pending before the court and that he had no notice of such motion. Moreover, Mr. Ashburn went on to argue, at least to an extent, the merits of the defense, stating that, although the two parties lived together in the marital home, they were not living as man and wife as they only had sex one time, and that the defense of condonation does not apply to a continuing course of conduct such as habitual and excessive use of drugs. We also acknowledge the authority supporting the principle that, although condonation is an affirmative defense that should be specifically pled, even if such is not pled, a court has the discretion to refuse a grant of divorce if the evidence demonstrates condonation. See Polk v. Polk, 228 Cal.App.2d 763, 778, 39 Cal.Rptr. 824 (Cal.Ct.App.1964); Crews v. Crews, 130 Fla. 499, 178 So. 139, 141 (1938); 24 Am.Jur.2d Divorce and Separation § 271 (2007).[10]
¶ 28. However, Mrs. Ashburn did not file a brief raising any of these issues. This failure is equivalent to admission of error, and we are to accept such admission unless we are confident that the chancellor committed no error. Sanders, 819 So.2d at 1277 (quoting Dethlefs, 458 So.2d at 717). In the case sub judice, we cannot say with complete confidence that the chancellor did not err in dismissing Mr. Ashburn's complaint for divorce based on condonation. Therefore, we find that the chancellor erred in dismissing Mr. Ashburn's complaint for divorce based on the affirmative defense of condonation when Mrs. Ashburn did not plead such defense. In any event, as will be discussed below, regardless of whether the affirmative defense of condonation was available to Mrs. Ashburn, we find that the chancellor erred in concluding that Mr. Ashburn condoned Mrs. Ashburn's habitual drug use.[11]
*215 II. Did the chancellor err in finding that Mr. Ashburn condoned Mrs. Ashburn's habitual and excessive drug use?
¶ 29. Mr. Ashburn argues that the chancellor erred in denying his complaint for divorce based on the finding that he condoned Mrs. Ashburn's habitual drug use by continuing to cohabit and have sexual relations with her after he filed for divorce. The chancellor found that although there was ample evidence of habitual drug use on the part of Mrs. Ashburn prior to June of 2005, Mr. Ashburn's resumption of sexual relations with Mrs. Ashburn condoned any such drug use, and that there was no evidence of habitual drug use after June of 2005. In so holding, the chancellor relied primarily on Cheatham v. Cheatham, 537 So.2d 435, 442 (Miss.1988), in which the court stated that "mere cohabitation without resumption of sexual relations might support a finding of uncondoned adultery." The chancellor interpreted this statement as indicating that cohabitation with a resumption of sexual relations constitutes condonation.
¶ 30. Mr. Ashburn testified that, during the time he was living in the marital home, he and Mrs. Ashburn only had sex one time in 2003 while Mrs. Ashburn testified that the two had sex two to three times a week. The chancellor did not make a specific finding as to how many times Mr. and Mrs. Ashburn had sexual intercourse between the time Mr. Ashburn moved back into the marital home and the time he moved out. Rather, the chancellor merely stated that he believed the truth to be somewhere in the middle of the two figures given by Mr. and Mrs. Ashburn, but that he could not and would not try to determine the exact number. Importantly, however, the chancellor then stated that, even if he accepted Mr. Ashburn's testimony that the two only had sex one time, such would be sufficient to condone Mrs. Ashburn's drug use until the two separated again in June of 2005. Given this statement, and without the benefit of a factual finding by the chancellor as to how many times Mr. and Mrs. Ashburn had sex during the cohabitation, this Court must assume that the chancellor's holding that Mr. Ashburn condoned Mrs. Ashburn's habitual drug use was based solely on the fact that Mr. and Mrs. Ashburn had sex one time in 2003. Based on such holding, we find that the chancellor manifestly erred.
¶ 31. The defense of condonation is summarized as follows:
Condonation is the forgiveness of a marital wrong on the part of the wronged party. Condonation may be express or implied. The mere resumption of residence does not constitute a condonation of past marital sins and does not act as a bar to a divorce being granted. Condonation, even if a true condonation exists, is conditioned on the offending spouse's continued good behavior. If the offending party does not mend his or her ways and resumes the prior course of conduct, there is a revival of the grounds for divorce. In practical effect, condonation places the offending spouse on a form of temporary probation. Any subsequent conduct within a reasonable time after resumption of cohabitation which evidences an intent not to perform the conditions of the condonation in good faith, may be sufficient to avoid the defense of condonation, even though the *216 conduct so complained of in and of itself may not be grounds for divorce. An entire course of conduct rule applies. A party's conduct both before and after the alleged condonation can be joined together to establish the cause for divorce.
Cherry v. Cherry, 593 So.2d 13, 17-18 (1991) (citations omitted); see also Deborah H. Bell, Bell on Mississippi Family Law, § 4.03(6)(d) (2005) (citing Wood v. Wood, 495 So.2d 503, 505 (Miss.1986)) ("[c]ondonation is conditional, based upon the future good behavior of the guilty spouse; [i]f the conduct recurs, the innocent spouse may obtain a divorce based in part upon conduct prior to condonation"); Miss.Code Ann. § 93-5-4 (Rev.2004) ("It shall be no impediment to a divorce that the offended spouse did not leave the marital domicile or separate from the offending spouse on account of the conduct of the offending spouse.") "The doctrine of condonation applies to what is generally denominated `non-continuing causes of divorce,' consisting of a single act, or a series of acts of misconduct, which might be forgiven as a result of affectionate treatment; but the doctrine is not applicable to causes of divorce of a continuing character." Manning v. Manning, 160 Miss. 318, 320, 133 So. 673, 674 (1931). Just as habitual cruel and inhuman treatment has been held to be a continuing offense, Id. at 320, 133 So. at 674, so too is habitual and excessive drug use.
¶ 32. In the case sub judice, the chancellor found that one act of sexual intercourse between Mr. and Mrs. Ashburn in 2003 was sufficient to condone any habitual drug use on the part of Mrs. Ashburn up until the time Mr. Ashburn finally moved out of the marital home in June of 2005. However, in so finding, the chancellor failed to accord appropriate significance to the evidence of Mrs. Ashburn's drug use after the time of the sexual intercourse but before Mr. Ashburn moved out of the marital home. Specifically, it is undisputed that Mrs. Ashburn was admitted to the hospital in February of 2004 after overdosing on the prescription drug Lortab. As was noted above, a cause of action for divorce may be revived if, after the condonation, the offending spouse exhibits an intent not to abide by the conditions of the condonation. Cherry, 593 So.2d at 17-18. Thus, even assuming that one act of sexual intercourse between Mr. and Mrs. Ashburn in 2003 condoned Mrs. Ashburn's habitual drug use prior to this time, such condonation was conditioned on Mrs. Ashburn ceasing to abuse drugs and it can hardly be disputed that Mrs. Ashburn's overdosing on a prescription drug in 2004 evidenced an intent not to abide by such condition. Accordingly, Mr. Ashburn's ground for divorce was revived when Mrs. Ashburn continued to abuse drugs after the condonation.
¶ 33. Although one act of drug use in 2004 might be insufficient on its own to constitute grounds for divorce, "[a]n entire course of conduct rule applies" and "conduct both before and after the . . . condonation can be joined together to establish the cause for divorce." Cherry, 593 So.2d at 18. The chancellor found that there was ample evidence of habitual drug use on the part of Mrs. Ashburn prior to June of 2005, at least up until her overdose in 2004, and this finding is clearly supported by substantial evidence in the record. The chancellor erred, however, in failing to find that Mrs. Ashburn's 2004 drug use voided the 2003 condonation and revived Mr. Ashburn's habitual drug use ground for divorce. When Mrs. Ashburn's drug use prior to the time of the condonation in 2003 is combined with her 2004 drug use, it is clear that Mr. Ashburn was entitled to a grant of divorce on the grounds of habitual *217 drug use.[12] Accordingly, we reverse the chancellor's ruling dismissing Mr. Ashburn's complaint for divorce and remand for an entry of divorce not inconsistent with this ruling.
III. Did the chancellor err in assessing all remaining guardian ad litem fees to Mr. Ashburn?
¶ 34. Mr. Ashburn contends that the chancellor erred in assessing all of the remaining guardian ad litem fees to Mr. Ashburn when the parties had agreed that such fees would be divided equally amongst them and based on the fact that the guardian ad litem would not have been necessary were it not for Mrs. Ashburn's drug use and propensity for committing criminal acts. "`Chancery courts have large discretion in apportioning costs. Nevertheless, the exercise of such discretion is not final, but is reviewable on appeal, and if it appear [sic] that the decree apportioning the costs works a manifest injustice on any of the parties, the decree will be reversed.'" In re: K.M.J. v. W.A., 758 So.2d 402, 403(¶ 6) (Miss.2000) (quoting Canton v. Ross, 157 Miss. 788, 796, 128 So. 560, 562-63 (1930)).
¶ 35. Although the chancellor did not provide his reasoning for assessing the remaining guardian ad litem fees to Mr. Ashburn, we find no error in the chancellor's ruling in this regard. First, Mr. Ashburn cites to no portion of the record indicating that the parties agreed to divide all guardian ad litem fees equally.[13] In fact, the consent order by which the parties agreed to the appointment of the guardian ad litem specifically states that, other than an initial $1,000 that was to be deposited with the guardian ad litem no later than October 12, 2004, the responsibility for such fees was reserved for determination by the court. Second, despite his contention that a guardian ad litem would not have been necessary were it not for Mrs. Ashburn's conduct, the fact remains that Mr. Ashburn was the one who requested the appointment of the guardian ad litem. Finally, "[t]he chancery court is charged to give adequate consideration to the `financial abilities' of the parties to pay any assessed fees, and then how should the same be apportioned, if any." Id. at 404 *218 (citing Bumgarner v. Bumgarner, 475 So.2d 455, 456 (Miss.1985)). Mr. Ashburn was employed at the time of the chancellor's ruling while Mrs. Ashburn was unemployed and admitted to having no net monthly income. Thus, Mr. Ashburn was in the best position to pay the guardian ad litem fees. Based on these considerations, we find that requiring Mr. Ashburn to pay the remaining guardian ad litem fees did not work a "manifest injustice" on Mr. Ashburn. Accordingly, we affirm the chancellor's assessment of the remaining guardian ad litem fees to Mr. Ashburn.
¶ 36. THE JUDGMENT OF THE DESOTO COUNTY CIRCUIT COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] Mr. Ashburn testified that the two rarely slept in the same bed, and one of them either slept on the couch or made a pallet.
[2] Mr. Ashburn stated that he took the pills, other than one day's worth of medication, and locked them up in a box, but that large numbers of pills would go missing. He stated that Mrs. Ashburn blamed it on her daughter, Emily.
[3] Ms. Francis testified that she called Mr. Ashburn that night and informed him of the incident. The guardian ad litem appointed in this matter, Debra Brannan, testified that Mrs. Ashburn was arrested in January of 2004 for theft based on this incident.
[4] She also admitted to doing acid and powder cocaine in the past, but stated that she had not used drugs in the past four or five years except on the night before her testimony for medical reasons.
[5] Mrs. Ashburn stated that the reason Dr. Flumere stopped treating her was because she brought in another doctor to take over her treatment and because Dr. Flumere wanted her to see a therapist on an outpatient basis, but she refused to do so. A letter from Dr. Flumere to Mrs. Ashburn was admitted into evidence at trial for identification purposes only, wherein Dr. Flumere stated that she would no longer be able to prescribe psychotropic drugs (specifically Effexor, Elavil, and Klonopin) to Mrs. Ashburn in light of the fact that Mrs. Ashburn had tested positive for cannabis, amphetamines/methamphetamines, hydrocodone, and hydromorphone.
[6] Although Mrs. Ashburn's counsel never specifically referred to the term condonation in arguing the motion to dismiss, the motion was based on the contention that Mr. and Mrs. Ashburn resumed cohabiting as man and wife, mentally and physically, for three years after Mr. Ashburn filed for divorce. Moreover, at the conclusion of her case, Mrs. Ashburn asked the court to revisit the motion to dismiss, and then moved for a directed verdict based on the contention that Mr. Ashburn had not proven his case for a divorce due to his condonation or ratification. Thus, although Mrs. Ashburn's counsel did not specifically mention condonation as it pertained to the motion to dismiss, it seems clear that such was the true basis of the motion.
[7] A grant of divorce on the ground of habitual and excessive drug use requires the complainant to "establish that the spouse's use of drugs (1) was habitual and frequent; (2) was excessive and uncontrollable; (3) and was of morphine, opium or drugs with the similar effect as morphine or opium." Lawson v. Lawson, 821 So.2d 142, 145(¶ 9) (Miss.Ct. App.2002) (citing Ladner v. Ladner, 436 So.2d 1366, 1375 (Miss.1983)).
[8] See also Parker v. Parker, 519 So.2d 1232, 1234 (Miss.1988) (stating that the divorce defense of recrimination is an affirmative defense).
[9] After the chancellor issued his ruling in open court, Mr. Ashburn raised the issue that Mrs. Ashburn never pled the defense of condonation. Mr. Ashburn's counsel indicated that she objected on such ground at the beginning of the trial; however, Mr. Ashburn's counsel never stated that her objection was based on the contention that condonation was an affirmative defense. Regardless, the chancellor stated that both parties were free to pursue whatever remedies they chose based on the rules of civil procedure. Mr. Ashburn raised this issue again in his motion to alter or amend the chancellor's ruling. The chancellor denied such motion without explanation.
[10] We note that this Court has held that "a defendant's pretrial motion that seeks a ruling on an affirmative defense which has not been included in the pleadings . . . should be evaluated under the same rule as would apply if that defense was raised at trial. Under Rule 15(b), the evidence and the defense should be accepted unless the objecting party can `satisfy the court that the admission of such evidence [in support of the affirmative defense] would prejudice the maintaining of the action or defense.'" Rankin v. Clements, 905 So.2d 710, 715(¶ 18) (Miss.Ct.App.2004) (overruled on other grounds). However, in Rankin, we specifically noted that the pretrial motion at issue was not made on the "eve of a scheduled trial." Id. at 713(¶ 10). Such is not the case here in that Mrs. Ashburn's motion to dismiss was made at the commencement of the trial in this matter. Having been apprised of a possible defense to his complaint for divorce on the day the trial started, it can hardly be disputed that Mr. Ashburn was at least somewhat prejudiced by the chancellor's entertaining the condonation defense.
[11] Mr. Ashburn also argues that Mrs. Ashburn's motion to dismiss at the commencement of the trial was a Rule 12(b)(6) motion that became a motion for summary judgment due to Mrs. Ashburn never having raised the affirmative defense of condonation. Thus, argues Mr. Ashburn, pursuant to Rule 56 of the Mississippi Rules of Civil Procedure, he should have been given at least ten days notice before the time that the motion was heard by the court. Rule 56(c) states that a motion for summary judgment "shall be served at least ten days before the time fixed for the hearing." M.R.C.P. 56(c). However, Mrs. Ashburn's motion cannot be characterized as a Rule 12(b)(6) motion or a summary judgment motion because trial itself was held on the issues presented in the motion. Therefore, Mr. Ashburn's reliance on Rule 56 is misplaced. Regardless, Mr. Ashburn's true complaint is that the chancellor denied the complaint for divorce based on the affirmative defense of condonation when such defense was not pled by Mrs. Ashburn, and we have already determined that such constituted reversible error under the circumstances of this case.
[12] As was previously mentioned, a grant of divorce on the ground of habitual and excessive drug use requires the complainant to "establish that the spouse's use of drugs (1) was habitual and frequent; (2) was excessive and uncontrollable; (3) and was of morphine, opium or drugs with the similar effect as morphine or opium." See supra n. 7. Abuse of prescription drugs has been held to constitute habitual and excessive drug use. Lawson, 821 So.2d at 145 (finding habitual and excessive drug use on the part of wife who obtained, and abused, prescription drugs through over-prescription by doctors and by getting prescriptions from multiple doctors who were unaware of each other).

It is worth noting that the chancellor discussed Lt. Jones's testimony that he had visited Mrs. Ashburn's home approximately twenty times in the past twelve months and that out of those twenty times he observed Mrs. Ashburn under the influence of drugs fifteen times; however, the chancellor found that Lt. Jones did not distinguish as to whether Mrs. Ashburn was under the influence of prescribed medications or the type of drugs noted in Lawson. Admittedly, Lt. Jones was not clear as to whether he believed Mrs. Ashburn to have been abusing drugs during those fifteen times. However, the chancellor's statement is somewhat peculiar because Lawson involved a situation in which the wife abused drugs such as Lortab and Hydrocodone which were prescribed to her by a physician. Thus, the prescription drugs involved in the case sub judice are either identical or substantially equivalent to those in Lawson.
[13] Presumably, Mr. Ashburn is referring to his motion for the appointment of a guardian ad litem, in which he sought an order appointing a guardian ad litem with all costs to be divided equally between the parties.