KING, Justice,
for the Court:
¶ 1. The Hancock County Chancery Court granted Stacy Ruth Carambat a divorce from James Edward Carambat on the ground of habitual and excessive drug use. Aggrieved, James appeals, arguing that the chancellor erred by granting the divorce, because his marijuana use did not affect the marriage, was not excessive, and was not akin to using opium, morphine, or other, like drugs. We find no error and affirm the chancery court’s judgment.
FACTS AND PROCEDURAL HISTORY
¶ 2. James and Stacy married on March 20, 1993, in Metairie, Louisiana. They eventually moved to Mississippi, where they resided throughout the marriage, finally settling in Diamondhead, Mississippi, in 2004. The couple had twin boys— James Eugene Carambat and Tyler William Carambat — who were born on January 9,1999. James and Stacy separated in August 2008, and Stacy filed for divorce on September 17, 2008.
¶ 3. Stacy alleged three grounds for divorce: irreconcilable differences, habitual cruel and inhuman treatment, and habitual and excessive drug use. She requested custody of the twins, child support, equita *507 ble distribution of the assets, alimony, and attorney’s fees. James answered Stacy’s complaint for divorce on July 20, 2009. In his answer, James denied Stacy’s grounds for divorce, her claim that they had not cohabited since the separation, and her claim that she should have custody of the twins.
A. James’s Drug Use
¶ 4. During the trial, Stacy, James, and Barbara Ruth (Stacy’s mother) testified about the couple’s marriage. Before the couple married, Stacy knew that James regularly smoked marijuana, and James admitted that he had been smoking marijuana since he was fourteen years old. James continued smoking marijuana throughout the marriage.
¶ 5. Although the couple had conversations about James’s need to cease his marijuana use, James stated Stacy never asked him to quit. Stacy thought James would stop his drug use once the twins were born. According to Barbara, James called her after the twins were born, acknowledged his drug use as a problem, and told her he intended to quit. Because of James’s marijuana use, Stacy was afraid that he would get into legal trouble, especially since he often picked her up from work with marijuana in the car. Several times during the marriage, James managed to go weeks without using marijuana. He said the longest period of time was one month. But he would always start using again.
¶ 6. Stacy testified that James had used other drugs. He once smoked cocaine at the beginning of their marriage, and' he used Xanax, which was not prescribed to him, to cope with sleep deprivation. James stated that the cocaine incident had happened one time in 1995 or 1996. He said he took Xanax for two years, but that was several years ago. James testified that he had not used marijuana since January 2009, and he was willing to take a drug test.
¶ 7. James was questioned about the frequency of his marijuana use. James testified that he would purchase one quarter-ounce bag of marijuana per month, which cost between thirty-five and fifty dollars. James could make six to seven cigarettes with this amount. Stacy said James smoked marijuana multiple times a day, starting in the morning before work. Both parties stated that the children were never exposed to James’s drug use because James smoked the marijuana in the garage.
B. James’s Interaction with the Family
¶ 8. According to Stacy, James’s drug use affected his interactions with the family, causing him to develop a routine:
[H]e would leave for work and smoke, and then go to work [sic] and then come home, and he would get undressed, go out to the garage and smoke again, and then he would come home, sit on the couch and wait for dinner to be fixed. And then eat dinner and then return back to the couch or to the computer room. He almost isolated himself from us totally.
Stacy often went to bed alone, and James would stay awake to use the computer or to watch television. Stacy stated that this took a toll on their marriage. Stacy also testified that, after the twins were born, she withdrew from James on an intimate level. James agreed and stated that Stacy’s disinterest caused him to withdraw as well.
¶ 9. Stacy also testified that it was a chore to get James to participate in family activities. Most times, James would stay home instead of coming to family fune- *508 tions. Barbara echoed Stacy’s sentiments, stating that James had become disinterested in attending family functions three years ago.
¶ 10. James said that his marijuana use was casual, and that he was not dependent on it. According to James, marijuana had a calming effect on him. He explained that marijuana did not keep him from family functions; he just did not care to be around Stacy’s family. James also stated that he was actively involved with the twins and their extracurricular activities— fishing, “bb” guns, and sports. James said he also helped the twins with their homework. Stacy agreed, but she said that James had come to only a few of the twins’ school activities — such as parent-teacher conferences.
C. Financial Trouble
¶ 11. Stacy testified that James’s marijuana use affected his work productivity. While employed with a printing company in Biloxi, Mississippi, James botched a printing job that cost several thousand dollars to reprint.[1] He was demoted as a result.[2] The demotion caused James to lose his bonus pay. According to Stacy, James told her that his drug use probably played a part in the incident. Stacy said that, afterwards, James tried to stop smoking marijuana. On cross examination, James’s trial counsel impeached Stacy with her deposition testimony. In her deposition, Stacy was asked whether James’s work incident was a mistake or a result of his drug use. Stacy responded that it was a mistake. She also agreed with trial counsel’s statement that no one at James’s job had linked the error to his marijuana use.
¶ 12. James denied telling Stacy that marijuana had caused his work error. He said he did not smoke marijuana before work, and his marijuana use never affected his job performance. James said the printing industry was stressful, and he smoked marijuana after work to relax. James also stated that he had never been fired from a job, but he had been laid off by at least two previous employers.
¶ 13. Stacy testified that James’s drug use and mistake on the job affected the family’s financial stability. James blamed their financial issues on Stacy’s credit-card use. Stacy said they had borrowed $3,000 to $5,000 from her parents because they could not pay their bills, and James had continued to purchase marijuana during their financial troubles. Barbara testified that she and her husband had loaned Stacy and James up to $7,000. In addition, James said that he had borrowed at least $25,000 from his brother after he was laid off. James said he had used the money to pay for a dental surgery, credit-card debt, and the family’s living expenses after Hurricane Katrina.
D. James’s Behavior
¶ 14. Barbara said Stacy always appeared nervous around James and cautioned others to censor themselves around him. Stacy stated James would make derogatory comments — sometimes in her family’s presence — about her clothing, income potential, and propensity to flirt with other men. Barbara had witnessed one such argument four to five years previously at a wedding. According to Barbara, *509 James had yelled at Stacy about her clothing in front of other guests and eventually had stormed out of the wedding. James denied that the argument was about Stacy’s clothing. Barbara also said James had argued with Stacy about other men at a family gathering three years before.
¶ 15. Stacy said James cursed at her after she had filed for divorce, and their arguments had increased from weekly to daily. She stated James called her derogatory names in front of the children. They also had a big argument in front of the children, after which she and the twins retreated to the bedroom to avoid confrontation. James stated that he and Stacy did not have any more problems than any other married couple. He stated that they often argued about finances, mainly outside the children’s presence. He denied ever physically abusing Stacy, and Stacy testified that James never physically abused her.
E. Stacy’s Affair
¶ 16. After moving to Diamondhead, James said Stacy met new friends at the country club and had begun to socialize with them often. Stacy expressed that she needed time away from the children. At first, James did not think her request was strange. But the frequency of Stacy’s excursions increased in 2008. Stacy also had lost weight, began dressing differently, and purchased lingerie. James found Stacy’s lingerie and questioned her about it. She told him that she had bought it for herself. These events caused James to suspect Stacy of cheating.
¶ 17. According to James, in 2008, he and Stacy attended a party at the home of Royce Wilkinson, one of Stacy’s male friends.[3] James felt uncomfortable at the party because other men were flirting with Stacy. James stated that, later that year, he had called Stacy and questioned her about her whereabouts. Stacy had informed James that she was at Wilkinson’s home taking care of his dog, and she and the twins had taken a ride in Wilkinson’s golf cart. James said he was upset because, if anyone had seen his wife and children in Wilkinson’s golf cart, they might have gotten the wrong idea. An argument ensued, during which Stacy told James that she was no longer happy and wanted a divorce.
¶ 18. When Stacy filed for divorce, James thought that they could work it out. According to James, Stacy complained only that they were no longer a family and that he was not helping out at home. James said Stacy never mentioned his marijuana use, and Stacy testified that she did not give James an ultimatum concerning his marijuana use. James had suggested that they seek counseling, but he stated that Stacy was not interested. They did seek counseling individually but not as a couple. James did not believe that his marijuana use contributed to the demise of the marriage. Instead, he believed that their arguments caused the separation.
¶ 19. At the time of trial, Stacy was dating a man named Tom Henry. Stacy met Henry in October 2007, but she claimed that their relationship did not develop until April 2008. Stacy testified that she had been disenchanted with James well before her relationship with Henry, and that she had contemplated divorcing James at least one to two years earlier. Since filing for divorce in September 2008, Stacy said that she and Henry had developed a sexual relationship and were in love. During her relationship with Henry, Stacy and James remained in the same household until April 2009.
*510 F. The Chancellor’s Ruling
¶ 20. Although this was a chancery court matter, James moved for a directed verdict.[4] First, he argued that Stacy had failed to provide evidence of habitual cruel and inhuman treatment. Stacy agreed. Thus, this ground for divorce was dismissed. Next, James argued that Stacy had failed to provide evidence of habitual and excessive use of opium, morphine, or other like drugs. The chancellor found that the evidence regarding James’s habitual and excessive drug use was more favorable to Stacy. James raised condo-nation as a defense, and Stacy objected, arguing that James had failed to plead condonation as an affirmative defense. James also argued that Stacy’s adultery had caused the divorce. The chancellor stated that he could not grant a divorce to both parties and reminded James that he had failed to request a divorce on the ground of adultery. Accordingly, the chancellor denied James’s motion.[5]
¶ 21. The chancellor entered the “Judgment of Divorce” on September 24, 2009. The chancellor found James’s own admission that he had regularly smoked marijuana from fourteen years of age to fifty-five years of age was evidence that his use was habitual and frequent. The chancellor found that James’s drug use was excessive and uncontrollable because James smoked daily, he could not quit, and his drug use affected his work productivity and finances. Last, the chancellor found James’s marijuana use met the definition of “other like drug” and caused his marriage to be repugnant to his spouse. Although not the same chemical make-up as opium and morphine, the chancellor determined that marijuana had the same effect, impairing James’s ability to perform his job and to support his family.
¶ 22. For those reasons, the chancellor granted Stacy’s divorce on the ground of habitual and excessive use of drugs. The chancellor awarded Stacy custody of the twins, the marital home, and attorney’s fees.[6] The chancellor granted James visitation and ordered him to pay child support and obtain medical insurance for the twins.
¶ 23. James filed several post-trial motions regarding his visitation and child-support obligation. The chancellor denied James’s requested relief. On April 7, 2010, James filed a motion to reopen the time for appeal. The chancellor granted James’s request on July 20, 2010. On July 26, 2010, James timely filed his notice of appeal.
ANALYSIS
¶ 24. In a divorce proceeding, the chancellor is the finder of fact, and the assessment of witness credibility lies within his sole province. Sproles v. Sproles, 782 So.2d 742, 746 (¶ 12) (Miss.2001). Thus, we will not disturb a chancellor’s findings when supported by substantial ev *511 idence unless the chancellor’s judgment was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. Id. at 746 (¶¶ 12-13).
Whether the chancellor erred by granting Stacy a divorce on the ground of habitual and excessive use of opium, morphine, or other like drug.
¶ 25. James argues that the chancellor erred by granting Stacy a divorce because she did not prove that his drug use was excessive and an “other like drug” as required by the statute. James also maintains that Stacy condoned his marijuana use and that his marijuana use did not cause any family, marital, or work issues. Instead, James blames the marriage’s demise on Stacy’s extramarital affairs.
¶ 26. Conversely, Stacy asks the Court to affirm the chancellor’s judgment. She argues that there is substantial evidence to support the chancellor’s finding that James’s drug use was habitual, excessive, and harmful to the family. Stacy also contends that the effect of marijuana is much like the effect of opium and morphine; thus, it is an “other like drug” for purposes of the statute. Because James did not specifically plead condonation as a defense, Stacy argues that it is waived. Stacy also maintains that James waived his recrimination argument because he failed specifically to plead it. Alternatively, Stacy argues that the chancellor may still grant a divorce even when both parties are at fault.
I.Condonation
¶27. First, we address James’s claim that Stacy was not entitled to a divorce because she had condoned his drug use. According to Stacy, she dated James two years before marrying him, and she knew about his drug use all along. But affirmative defenses, such as condonation, must be specifically pleaded or else they are waived. M.R.C.P. 8(c); Ashburn v. Ashburn, 970 So.2d 204, 212 (¶ 23) (Miss.Ct.App.2007) (citing Goode v. Village of Woodgreen Homeowners, 662 So.2d 1064, 1077 (Miss.1995)). Based upon our review of the record, James failed to plead condo-nation, and Stacy objected to his raising the defense at trial. Thus, we find that this argument has been waived.
II. Recrimination
¶28. Next, James argues, under the doctrine of recrimination, that Stacy’s adultery actually led to the demise of the marriage. But James did not file a cross-claim for divorce, and he did not plead recrimination. Even if James had pleaded the doctrine of recrimination, it would not have precluded Stacy from being granted a divorce.[7] See Miss. Code Ann. § 93-5-3 (Rev.2004). Thus, we find that this argument is barred from review.
III. Habitual and Excessive Use of Opium, Morphine, or Other Like Drug
¶ 29. Mississippi Code Section 93-5-1 (Rev.2004) lists “habitual and excessive use of opium, morphine, or other like drug” as a ground for divorce. A grant of divorce on this ground requires the plaintiff to establish that the spouse’s drug use was (1) habitual and frequent, (2) excessive and uncontrollable, and (3) that involved opium, morphine, or drugs with a similar effect as opium or morphine. Lad *512 ner v. Ladner, 436 So.2d 1366, 1375 (Miss.1983).
A. Habitual & Frequent Use
¶ 30. Habitual use is established by showing that the spouse customarily and frequently used drugs. Ladner, 436 So.2d at 1373. Stacy presented evidence that James began smoking marijuana at the age of fourteen, and his use continued until the age of fifty-five. James concedes that his drug use was habitual and frequent, testifying that he had used marijuana almost daily. As a result, we find substantial evidence in the record to support the chancellor’s finding that James’s drug use was habitual and frequent.
B. Excessive & Uncontrollable Use
¶ 31. Excessive drug use requires a showing that the offending spouse abused drugs. Ladner, 436 So.2d at 1373-1374. The offending spouse “must be so addicted to the use of drugs that he cannot control his appetite for drugs whenever the opportunity to obtain drugs is present.” Id.
¶ 32. James argues that his drug use was casual, it relaxed him, and he was not dependent on it. The evidence shows the contrary. Stacy and James testified that James had attempted to stop smoking marijuana several times, quitting for weeks at a time. But, as James stated himself, he always went back to it.
¶ 33. James argues that his drug use was not as serious as that of the spouses in Ladner and Ashburn. In Ladner, the spouse deceitfully obtained numerous prescription drugs from multiple doctors. Ladner, 436 So.2d at 1369. He abused the prescription drugs continuously for four years and exceeded the prescribed dosages. Id. The spouse’s drug use negatively affected his attitude, actions, work habits, and family and social relationships. Id. The wife testified that her husband was hyperactive in the morning — having taken Ritalin — and practically immobile in the evening — after taking tranquilizers. Id. He worked only two days per week and spent the rest of the time in idleness and agitation. Id. He also ceased communicating with friends. Id. Because of his drug habit, the spouse had squandered his son’s savings account, and had taken many valuable items from the home. Id.
¶ 34. Likewise, in Ashburn, the spouse’s drug use was excessive and uncontrollable. In this case, the wife abused prescription drugs throughout the marriage, also deceitfully obtaining prescriptions and exceeding the prescribed dosages. Ashburn, 970 So.2d at 207 (¶ 7). She once left home and did not return for weeks. Id. The husband testified that his wife would be yelling one day and drooling in a drug-induced state the next. Id. at 208 (¶ 8). She forged his name on checks and also stole someone else’s written prescription. Id. at 208 (¶¶ 8-9). The wife’s drug use increased to the point where she used a three-month supply of pills in one month and overdosed. Id. at 208 (¶ 7).
¶ 35. The extent of James’s addiction may not be as drastic as that of the spouses in Ladner and Ashburn, but it is obvious that James had a problem. Quitting for weeks at a time but then always going back to achieve a high is the nature of addiction. Like the spouse in Ladner, James abused the drug almost daily for years-approximately forty years in James’s case. This is evidence that, at the time, James could not control his appetite for marijuana. Also, the chancellor found that James’s marijuana use negatively impacted his interaction with his family, work productivity, and the family’s financial stability. There is substantial evidence in the record to support the chancellor’s findings. Thus, we hold that the chancellor did not *513 err by finding that James’s drug use was excessive and uncontrollable.
C. Opium, Morphine, or Other Like Drug
¶ 36. Next, James argues that Stacy failed to prove that marijuana is an “other like drug” similar to opium or morphine. In Section 93-5-1, the language “other like drug” does not mean a drug similar in chemical makeup to opium or morphine. Ladner, 436 So.2d at 1374. Instead, it refers to drugs with similar adverse effects.[8] Id. at 1374-1375 (finding that spouse’s abuse of prescription drugs produced similar effects as abuse of opium or morphine). In Ladner, the Court set forth factors to consider, along with other relevant circumstances, to determine whether a drug is an “other like drug” for purposes of Section 93-5-1:
[S]uch factors as the guilty spouse’s inability to support his wife and family or to properly attend to business should be considered. Additionally, the guilty spouse’s incapacity to perform other marital duties or his causing the marital relationship to be repugnant to the innocent spouse are equally important.
Id. at 1375.
¶ 37. In this case, the chancellor determined that James’s marijuana use had isolated him from the family and had caused him to botch a costly printing job. Consequently, James was demoted, and the chancellor determined that this had negatively impacted the family’s finances.
¶ 38. James points out that neither party cited a decision in which a divorce was granted based on marijuana use alone. We are not convinced that the absence of such a decision has any bearing on this case.
¶ 39. James argues that no credible evidence supported the chancellor’s finding that his marijuana use interfered with his ability to support and interact with his family and that his marijuana use caused the marital relationship to be repugnant to Stacy. Instead, James maintains that the evidence shows that Stacy sexually withdrew from him, pursued her own activities, and engaged in extramarital affairs. But the chancellor is the finder of fact, and the assessment of witness credibility lies within his sole province. Sproles, 782 So.2d at 746 (¶ 12). The chancellor resolved any conflicts in the evidence in favor of Stacy, and the evidence supports his decision.
¶ 40. The evidence shows that the family’s financial problems were due mainly to James’s layoffs. But by smoking marijuana, James, at least once, affected his work productivity and lost his bonus pay. In addition, he continued to purchase marijuana during the family’s economic troubles. James maintains that his marijuana expenditures were minimal and did not affect the family’s income. But he cannot escape the fact that spending money on illegal drugs is wasteful, especially when the family is suffering financially.[9] According to Stacy, James’s drug use created a routine in their marriage by which he would work, come home, use drugs and then sit on the couch or stay on the computer all night. Perhaps he did not isolate himself from his children, but he definitely isolated himself from Stacy. Stacy was worried that James would get arrested for possession of marijuana. And although Stacy did not give James an ultimatum, she was exasperated over his failed at *514 tempts to remain clean, causing her to file for divorce.
¶ 41. The evidence supports the chancellor’s finding that James’s marijuana use had a like effect to the use of opium or morphine. James evidenced an inability to support his family and to properly attend to business. This made the marriage repugnant to Stacy. Accordingly, we hold that the chancellor did not err by finding that James’s drug use involved opium, morphine, or a drug with a similar effect.
CONCLUSION
¶ 42. Stacy was entitled to a divorce based on James’s habitual and excessive use of marijuana. James conceded that his drug use was habitual and frequent. Evidence that James continuously used marijuana for approximately forty years and continuously failed at sobriety supports the chancellor’s finding that James’s drug use was excessive and uncontrollable. Furthermore, evidence that James’s marijuana use caused him to isolate himself from the family and affected his work productivity, which impacted the family’s finances, supports the chancellor’s finding that James’s marijuana use was similar in effect to opium or morphine. As a result, we affirm the chancellor’s judgment of divorce.
¶ 43. AFFIRMED.
WALLER, C.J., RANDOLPH, LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. CARLSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KITCHENS, J.

. The record does not state specifically what year the printing blunder occurred. However, the record reveals that the incident occurred some time after the family moved to Diamondhead in 2004.

. A year later, James was reinstated to his position.

. James and Stacy disagree as to the month the events occurred in 2008.

.James styled his motion as one for a directed verdict. But pursuant to Mississippi Rule of Civil Procedure 41(b), a motion to dismiss is the proper procedural mechanism. Rule 41(b) provides that:
[a]fter the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.

. At this time, James made an oral request for an interlocutory appeal, and the chancellor orally granted his request. The chancellor did not enter a formal order granting James's request, and James did not file a petition for interlocutory appeal with this Court.

. The chancellor did not award Stacy alimony.

. Section 93-5-3 provides that "[i]f a complainant or cross-complainant in a divorce action shall prove grounds entitling him to a divorce, it shall not be mandatory on any chancellor to deny such party a divorce, even though the evidence might establish recrimination on the part of such complainant or cross-complainant. ’ ’

. In Ladner, the spouse abused barbiturates, amphetamines, Dalmane, Libriam, Ativan, Nolundar, Mellaril, Sinequan, Vivactil, Tal-win, and Tylenol No. 3 with Codeine.

. During the trial, James admitted that buying illegal drugs is wasteful.